## COUNTY OF MOBILE v. KIMBALL.

1. The power conferred upon Congress by the commerce clause of the Constitution is exclusive, so far as it relates to matters within its purview which are national in their character, and admit or require uniformity of regulation affecting all the States. That clause was adopted in order to secure such uniformity against discriminating State legislation.

2. Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. To regulate it, as thus defined, there must be only one system of rules applicable alike to the whole country, which Congress alone can prescribe.

3. State legislation is not forbidden touching matters either local in their nature or operation, or intended to be mere aids to commerce, for which special regulations can more effectually provide, such as harbor pilotage, beacons, buoys, and the improvement of harbors, bays, and navigable rivers within a State, if their free navigation under the laws of the United States be not thereby impaired. Congress, by its non-action in such matters, virtually declares that, for the time being and until it deems fit to act, they may be controlled by State authority. The act of the State of Alabama, entitled "An Act to provide for the improvement of the river, bay, and harbor of Mobile," approved Feb. 16, 1867, is, therefore, not in conflict with the Constitution.

4. The provision for issuing bonds by the president and commissioners of revenue of Mobile County is not a taking of private property for public use, within the meaning of the Constitution of Alabama, nor can it be declared invalid, although it may impose upon one county the expense of an improvement in which the whole State is interested.

5. The harbor board was authorized by that act to provide for the contemplated improvement by entering into a contract therefor binding upon the county. If specific performance cannot for any reason be enforced in favor of the party who is thereunto entitled, on his completion of the work under the contract, a court of equity will adjudge that compensation in damages be made to him by the county.

6. A decree dismissing his bill *without prejudice* is not a bar to a subsequent suit for the same cause of action.

APPEAL from the Circuit Court of the United States for the Southern District of Alabama.

By an act of the General Assembly of Alabama, entitled "An Act for the improvement of the bay and harbor of Mobile," approved Feb. 21, 1860, the collector of customs for the port of Mobile, the mayor of the city of Mobile, and the president of the board of revenue for the county of Mobile, and their successors in office, were appointed *ex officio* a board to be styled the Board of Harbor Commissioners, for the purpose of causing the bay and harbor of Mobile to be deepened and improved. To aid the board in the performance of its powers and duties, the president and commissioners of revenue of the county were authorized and required from time to time, and as the same might be called for by the board, to issue the coupon bonds of the county, and to hand them over to the board to be sold. The proceeds were to be applied to the work as its necessities might require, and as authorized by the act. The whole amount of bonds was limited to $800,000. No steps were taken under the act. Another act was passed, Feb. 16, 1867, entitled "An Act to provide for the improvement of the river, bay, and harbor of Mobile." The president of the court of county commissioners of revenue of Mobile County, the mayor of Mobile, the president of the Bank of Mobile, the president of the Mobile Chamber of Commerce, and one citizen of the county of Mobile, to be appointed by the governor of the State, and their successors in office, were thereby constituted a board for the improvement of the river, harbor, and bay of Mobile. The president and commissioners of revenue of Mobile County were, by the second section, required to issue bonds for $1,000,000, payable as they might deem proper, to be delivered to the board whenever the latter might require them; and the court was required to levy and cause to be collected such tax as might be deemed proper to pay them.

The third and fourth sections are as follows: —

"SECT. 3. That said board for the improvement of the river, harbor, and bay of Mobile are hereby authorized to receive such bonds and apply them or the proceeds of them to the improvement, cleaning out, deepening, and widening of the river, harbor, and bay of Mobile, or any part thereof, or the making an artificial harbor,

and such improvement, cleaning out, deepening and widening or any part thereof or all of it; or the making an artificial harbor shall be made in such manner as the said board may direct, and for that purpose they may make any rules and regulations and assess the dues or tolls to be collected on vessels or water-crafts, and do any act they may deem proper to effect the objects of this act.

"SECT. 4. That, in addition to the foregoing powers, the said commissioners are vested with the authority to purchase and condemn lands according to the provision of sect. 13 of an act for the improvement of the bay and harbor of Mobile, approved Feb. 21, 1860, and to take and receive all moneys, papers, books, records, and surveys, and all property pertaining to said commissioners, in said act, and the city of Mobile shall be vested with the title of all lands made by the deposits of all excavations in the progress of this work as provided for in said act, and the commissioners designated in this act, and all officers, clerks, and employés, shall be subjected to and be held liable to the duties, penalties, and punishments provided for in the fifteenth section of the said act."

The harbor board was organized under the provisions of this act, and on the 24th of June, 1872, it entered into a contract with Kimball and Slaughter for dredging a channel through Dog River Bar, in the bay of Mobile. The work was to be commenced by the first day of August, 1872, and completed on or before June 1, 1873. The harbor board agreed to pay the contractors 49½ cents per cubic yard of material excavated and removed, and payments were to be made in bonds of the county of Mobile issued under this act, at the rate of 82½ cents on the dollar.

The work under the contract was completed March 15, 1873, and on the following day it was accepted by the engineer in charge, whose action was approved by the board.

Prior to June 1, 1873, the court of county commissioners had issued to the harbor board two hundred bonds of $1,000 each. The president of the harbor board admitted, June 5, 1873, that Kimball and Slaughter were then entitled to seventeen bonds of $1,000 each, and he delivered a written statement to that effect. The board delivered eleven bonds to them, July 29, 1873, leaving due to them six bonds.

Kimball and Slaughter, in their bill filed against the county of Mobile, claim and aver that, after the delivery to them of the eleven bonds, the board had neither bonds, money, nor other means to pay them, and that all the two hundred bonds delivered to it had been applied to the purposes for which they had been issued.

An act of the legislature of April 19, 1873, limited to the sum of $200,000 the issue of county bonds to the board, and required the latter to file a statement of its receipts and expenditures with the judge of probate of Mobile County.

On the 25th of November, 1873, the complainants presented to the court of county commissioners their claim for six bonds of $1,000 each, or their value in money at 82½ cents on the dollar. The claim was rejected.

The bill avers that on the 8th of December, 1873, the complainants filed their bill in the Chancery Court at Mobile, against the county of Mobile, to compel it to deliver, through the commissioner of revenue, six bonds to them, or to require it to pay the moneyed value of the bonds, and the interest due thereon; that a decree was rendered for the complainants, which, on appeal to the Supreme Court of Alabama, was reversed, mainly upon the ground that it did not sufficiently appear that the harbor board had not fully accounted for the two hundred bonds, of $1,000 each, delivered to it by the court of commissioners of revenue of Mobile County. The Supreme Court adjudged that the bill be dismissed without prejudice.

The following act of the legislature of Alabama was passed: —

"*An Act to close the Accounts and settle the Contracts made by the Board for the Improvement of the River, Harbor, and Bay of Mobile.*

"SECT. 1. Be it enacted by the General Assembly of Alabama, that it shall be and is hereby made the duty of the president and commissioners of revenue of Mobile County to inquire into the validity and propriety of all claims which may be presented to them for work and labor done and materials furnished or services rendered on any contract or agreement with the said board, made or executed between the fifteenth day of June and the first day of July, in the year eighteen hundred and seventy-two, for the im-

provement of the river, harbor, and bay of Mobile, under the act approved February sixteenth, eighteen hundred and sixty-seven, entitled 'An Act to provide for the improvement of the river, bay, and harbor of Mobile: ' *Provided*, such claim be presented to said president and commissioners within six months after the passage of this act; and upon the same being satisfactorily proved and shown to be still due and unpaid, it shall be the duty of said president and commissioners to provide for the payment thereof as of other claims against the county.

"Approved Feb. 23, 1876."

Under this act the complainants, April 3, 1876, presented to the court of county commissioners their claim for six bonds, or their value at 82½ cents on the dollar. The claim was rejected.

The complainants pray in their bill that the county be required to deliver to them six bonds of the county of $1,000 each, or pay their value at 82½ cents on the dollar, with interest from the completion and acceptance of the work.

The cause came on to be heard upon the pleadings and proofs, and a decree was rendered in favor of the complainants. The county then appealed here.

The remaining facts and the assignment of errors are set forth in the opinion of the court.

*Mr. John T. Morgan* for the appellant.

*Mr. C. W. Jones* for the appellees.

MR. JUSTICE FIELD delivered the opinion of the court.

The several positions taken by the appellant for the reversal of the decree of the Circuit Court may be resolved into these four: 1st, That the act of the legislature of Alabama of Feb. 16, 1867, "to provide for the improvement of the river, bay, and harbor of Mobile," is invalid, in that it conflicts with the commercial power vested in Congress; 2d, that if the act be not, for this reason, invalid, the expenses for the work authorized by it could not, under the Constitution of the State then in force, be imposed upon the county of Mobile, the work being for the benefit of the whole State; 3d, that the right of the complainants to relief is barred by a previous adjudication in the courts of the State against their claim; and, 4th, that the

case presented by the bill is not one for the cognizance of a court of equity. Each of these positions merits special consideration.

1. The act of Feb. 16, 1867, created a board of commissioners for the improvement of the river, harbor, and bay of Mobile, and required the president of the commissioners of revenue of Mobile County to issue bonds to the amount of $1,000,000, and deliver them, when called for, to the board, to meet the expenses of the work directed. The board was authorized to apply the bonds, or their proceeds, to the cleaning out, deepening, and widening of the river, harbor, and bay of Mobile, or any part thereof, or to the construction of an artificial harbor in addition to such improvement.

In June, 1872, the board of commissioners entered into a contract with the complainants, Kimball and Slaughter, to dredge and cut a channel through a designated bar in the bay, of specified width, depth, and distance, at a named price per cubic yard of material excavated and removed, and to receive in payment the bonds of the county, issued under the act mentioned, at the rate of 82½ cents on the dollar. In pursuance of this contract, the work agreed upon was at once undertaken by the complainants, and was completed by them in March, 1873, and accepted by the board through its authorized engineer. The amount due to them was paid, with the exception of seventeen bonds. The board gave them a certificate that they were entitled to that number of bonds, and, after some delay, delivered eleven to them. It is to obtain a delivery of the remaining six, or payment of their value, that the present suit is brought.

The objection that the law of the State, in authorizing the improvement of the harbor of Mobile, trenches upon the commercial power of Congress, assumes an exclusion of State authority from all subjects in relation to which that power may be exercised, not warranted by the adjudications of this court, notwithstanding the strong expressions used by some of its judges. That power is indeed without limitation. It authorizes Congress to prescribe the conditions upon which commerce in all its forms shall be conducted between our citizens and the citizens or subjects of other countries, and between the

citizens of the several States, and to adopt measures to promote its growth and insure its safety. And as commerce embraces navigation, the improvement of harbors and bays along our coast, and of navigable rivers within the States connecting with them, falls within the power. The subjects, indeed, upon which Congress can act under this power are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity of regulation, affecting alike all the States; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities. Of the former class may be mentioned all that portion of commerce with foreign countries or between the States which consists in the transportation, purchase, sale, and exchange of commodities. Here there can of necessity be only one system or plan of regulations, and that Congress alone can prescribe. Its non-action in such cases with respect to any particular commodity or mode of transportation is a declaration of its purpose that the commerce in that commodity or by that means of transportation shall be free. There would otherwise be no security against conflicting regulations of different States, each discriminating in favor of its own products and citizens, and against the products and citizens of other States. And it is a matter of public history that the object of vesting in Congress the power to regulate commerce with foreign nations and among the States was to insure uniformity of regulation against conflicting and discriminating State legislation.

Of the class of subjects local in their nature, or intended as mere aids to commerce, which are best provided for by special regulations, may be mentioned harbor pilotage, buoys, and beacons to guide mariners to the proper channel in which to direct their vessels.

The rules to govern harbor pilotage must depend in a great degree upon the peculiarities of the ports where they are to be enforced. It has been found by experience that skill and efficiency on the part of local pilots is best secured by leaving this subject principally to the control of the States. Their authority to act upon the matter and regulate the whole sub-

ject, in the absence of legislation by Congress, has been recognized by this court in repeated instances. In *Cooley* v. *Board of Wardens of the Port of Philadelphia*, the court refers to the act of Congress of 1789, declaring that pilots should continue to be regulated by such laws as the States might respectively thereafter enact for that purpose, and observes that "it manifests the understanding of Congress, at the outset of the government, that the nature of this subject is not such as to require its exclusive legislation. The practice of the States and of the national government has been in conformity with this declaration, from the origin of the national government to this time; and the nature of the subject, when examined, is such as to leave no doubt of the superior fitness and propriety, not to say the absolute necessity, of different systems of regulation, drawn from local knowledge and experience and conformed to local wants." 12 How. 299, 320.

Buoys and beacons are important aids, and sometimes are essential to the safe navigation of vessels, in indicating the channel to be followed at the entrance of harbors and in rivers, and their establishment by Congress is undoubtedly within its commercial power. But it would be extending that power to the exclusion of State authority to an unreasonable degree to hold that whilst it remained unexercised upon this subject, it would be unlawful for the State to provide the buoys and beacons required for the safe navigation of its harbors and rivers, and in case of their destruction by storms or otherwise it could not temporarily supply their places until Congress could act in the matter and provide for their re-establishment. That power which every State possesses, sometimes termed its police power, by which it legislates for the protection of the lives, health, and property of its people, would justify measures of this kind.

The uniformity of commercial regulations, which the grant to Congress was designed to secure against conflicting State provisions, was necessarily intended only for cases where such uniformity is practicable. Where from the nature of the subject or the sphere of its operation the case is local and limited, special regulations adapted to the immediate locality could only have been contemplated. State action upon such subjects can constitute no interference with the commercial power of

Congress, for when that acts the State authority is superseded. Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the States and requiring uniformity of regulation, is not to be taken as a declaration that nothing shall be done with respect to them, but is rather to be deemed a declaration that for the time being, and until it sees fit to act, they may be regulated by State authority.

The improvement of harbors, bays, and navigable rivers within the States falls within this last category of cases. The control of Congress over them is to insure freedom in their navigation, so far as that is essential to the exercise of its commercial power. Such freedom is not encroached upon by the removal of obstructions to their navigability, or by other legitimate improvement. The States have as full control over their purely internal commerce as Congress has over commerce among the several States and with foreign nations; and to promote the growth of that internal commerce and insure its safety they have an undoubted right to remove obstructions from their harbors and rivers, deepen their channels, and improve them generally, if they do not impair their free navigation as permitted under the laws of the United States, or defeat any system for the improvement of their navigation provided by the general government. Legislation of the States for the purposes and within the limits mentioned do not infringe upon the commercial power of Congress; and so we hold that the act of the State of Alabama of Feb. 16, 1867, to provide for the "improvement of the river, bay, and harbor of Mobile," is not invalid.

There have been, it is true, expressions by individual judges of this court, going to the length that the mere grant of the commercial power, anterior to any action of Congress under it, is exclusive of all State authority; but there has been no adjudication of the court to that effect. In the opinion of the court in *Gibbons* v. *Ogden*, the first and leading case upon the construction of the commercial clause of the Constitution, and which opinion is recognized as one of the ablest of the great Chief Justice then presiding, there are several expressions which would indicate, and his general reasoning would tend to

the same conclusion, that in his judgment the grant of the commercial power was of itself sufficient to exclude all action of the States; and it is upon them that the advocates of the exclusive theory chiefly rely; and yet he takes care to observe that the question was not involved in the decision required by that case. "In discussing the question whether this power is still in the States," he observes that, "in the case under consideration, we may dismiss from it the inquiry, whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We may dismiss that inquiry, because it has been exercised, and the regulations which Congress deemed it proper to make are now in full operation. The sole question is, Can a State regulate commerce with foreign nations and among the several States while Congress is regulating it?" And the decision was necessarily restricted by the limitations of the question presented. It determined that the grant of power by the Constitution, accompanied by legislation under it, operated as an inhibition upon the States from interfering with the subject of that legislation. The acts of New York giving to Livingston and Fulton an exclusive right to navigate all the waters within its jurisdiction, with vessels propelled by steam, for a certain period, being in collision with the laws of Congress regulating the coasting trade, were, therefore, adjudged to be unconstitutional. This judgment was rendered in 1824. 9 Wheat. 1. Some years later (1829) the case of *Willson* v. *Blackbird Creek Marsh Company* came before the court. There a law of Delaware authorizing the construction of a bridge over one of its small navigable streams, which obstructed the navigation of the stream, was held not to be repugnant to the commercial power of Congress. The court, Chief Justice Marshall delivering its opinion, placed its decision entirely upon the absence of any congressional legislation on the subject. Its language was: "If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide-flows, and which abound throughout the lower country of the Middle and Southern States, — we should not feel much difficulty in saying that a

State law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States, — a power which has not been so exercised as to affect the question." 2 Pet. 245, 252.

In the *License Cases*, which were before the court in 1847, there was great diversity of views in the opinions of the different judges upon the operation of the grant of the commercial power of Congress in the absence of congressional legislation. Extreme doctrines upon both sides of the question were asserted by some of the judges, but the decision reached, so far as it can be viewed as determining any question of construction, was confirmatory of the doctrine that legislation of Congress is essential to prohibit the action of the States upon the subjects there considered.

But in 1851, in the case of *Cooley* v. *Board of Wardens of the Port of Philadelphia*, to which we have already referred, the attention of the court appears to have been for the first time drawn to the varying and different regulations required by the different subjects upon which Congress may legislate under the commercial power; and from this consideration the conclusion was reached, that, as some of these subjects are national in their nature, admitting of one uniform plan or system of regulation, whilst others, being local in their nature or operation, can be best regulated by the States, the exclusiveness of the power in any case is to be determined more by the nature of the subject upon which it is to operate than by the terms of the grant, which, though general, are not accompanied by any express prohibition to the exercise of the power by the States. The decision was confined to the validity of regulations by the States of harbor pilotage; but the reasoning of the court suggested as satisfactory a solution as perhaps could be obtained of the question which had so long divided the judges. The views expressed in the opinion delivered are followed in *Gilman* v. *Philadelphia* (3 Wall. 713), and are mentioned with approval in *Crandall* v. *State of Nevada*, 6 id. 35. In the first of these cases the court, after stating that some subjects of commerce call for uniform rules and national legislation, and

that others can "be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operation to such localities respectively," says, "whether the power in any given case is vested exclusively in the general government depends upon the nature of the subject to be regulated." This doctrine was subsequently recognized in the case of *Welton* v. *State of Missouri* (91 U. S. 275), in *Henderson* v. *Mayor of New York* (92 id. 259), and in numerous other cases; and it may be considered as expressing the final judgment of the court.

Perhaps some of the divergence of views upon this question among former judges may have arisen from not always bearing in mind the distinction between commerce as strictly defined, and its local aids or instruments, or measures taken for its improvement. Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities. For the regulation of commerce as thus defined there can be only one system of rules applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible. Language affirming the exclusiveness of the grant of power over commerce as thus defined may not be inaccurate, when it would be so if applied to legislation upon subjects which are merely auxiliary to commerce.

2. The second objection of the appellant to the decree of the Circuit Court is equally as untenable as the first. The question of the validity of the act of Feb. 16, 1867, under the Constitution of Alabama at the time in force, was before the Supreme Court of the State in 1871. It was contended that the act contravened the article which forbade the taking of private property for public use without just compensation, or for private use, or the use of corporations other than municipal, without the consent of the owner, and the article which restrained the legislature from delegating power to levy taxes to individuals or private corporations. The court held that the act was not open to objection on either of these grounds, except

perhaps in the clause which authorized the board of commis-sioners to assess dues or tolls to be collected on vessels or water-craft; and if that clause could be deemed a delegation of the taxing power under the article mentioned, that portion only of the act was invalid.   The issue by the president and commissioners of revenue of Mobile County of bonds for the improvement of the river, bay, and harbor of Mobile was not a taking of private property for public use, within the meaning of the constitutional clause.   It was a loan of the credit of the county for a work public in its character, designed to be of general benefit to the State, but more especially and immedi-ately to the county.   The expenses of the work were of course to be ultimately defrayed by taxation upon the property and people of the county.   But neither is taxation for a public pur-pose, however great, the taking of private property for public use, in the sense of the Constitution.   Taxation only exacts a contribution from individuals of the State or of a particular district, for the support of the government, or to meet some public expenditure authorized by it, for which they receive compensation in the protection which government affords, or in the benefits of the special expenditure.   But when private property is taken for public use, the owner receives full com-pensation.   The taking differs from a sale by him only in that the transfer of title may be compelled, and the amount of com-pensation be determined by a jury or officers of the government appointed for that purpose.   In the one case, the party bears only a share of the public burdens; in the other, he exchanges his property for its equivalent in money.   The two things are essentially different.

The objection to the act here raised is different from that taken in the State court.   Here the objection urged is that it fastens upon one county the expense of an improvement for the benefit of the whole State.   Assuming this to be so, it is not an objection which destroys its validity.   When any pub-lic work is authorized, it rests with the legislature, unless re-strained by constitutional provisions, to determine in what manner the means to defray its cost shall be raised.   It may apportion the burden ratably among all the counties, or other particular subdivisions of the State, or lay the greater share

or the whole upon that county or portion of the State specially and immediately benefited by the expenditure.

It may be that the act in imposing upon the county of Mobile the entire burden of improving the river, bay, and harbor of Mobile is harsh and oppressive, and that it would have been more just to the people of the county if the legislature had apportioned the expenses of the improvement, which was to benefit the whole State, among all its counties. But this court is not the harbor, in which the people of a city or county can find a refuge from ill-advised, unequal, and oppressive State legislation. The judicial power of the Federal government can only be invoked when some right under the Constitution, laws, or treaties of the United States is invaded. In all other cases, the only remedy for the evils complained of rests with the people, and must be obtained through a change of their representatives. They must select agents who will correct the injurious legislation, so far as that is practicable, and be more mindful than their predecessors of the public interests.

3. The objection that the right of the complainants to relief is barred by a previous adjudication in the courts of the State against their claim arises in this wise: After the complainants had performed their work on the harbor of Mobile under the contract with the harbor commissioners, of June, 1872, and the work had been approved and accepted, the legislature passed the act of April 19, 1873, to regulate the further proceedings of the board, restricting the issue of bonds to the amount, including those already issued, of $200,000, and declaring that the harbor board should not, under any pretence whatever, be entitled to receive bonds to any greater amount. Bonds to that amount had already been delivered to the board, and for six of them, the number to which they were entitled, the complainants applied. The delivery of the bonds being refused, they brought suit against the county of Mobile to obtain them or their value.

Two grounds were alleged on which the responsibility of the county was asserted: one, that the harbor board had ceased to have anything to do with the improvement of the river, bay, and harbor of Mobile, and had turned over all the money and bonds left in its possession to the officials of the county; the other,

that the county through its officials had bought from the harbor board thirty-one of the two hundred bonds issued, at a price less than their market value, and had refused to deliver to the complainants the six due to them which they had demanded.

The District Court gave a decree for the complainants, but the Supreme Court reversed it, holding that upon the first ground the complainants were mistaken as to the situation of the harbor board, and that it continued to exist for the purpose of winding up and settling its business; and upon the second ground, that although thirty-one of the bonds had been purchased as stated, they had been cancelled before the complainants made the demand for six of them; and it was shown by the county that there still remained with the harbor board unaccounted for twenty-three of the two hundred bonds, which were more than sufficient to pay the complainants and other debts which the board owed. The court therefore decided that the delinquency complained of was that of the harbor board and not of the county; that the only obligations imposed upon the county were that it should issue its bonds upon the demand of the harbor board, and pay them according to their stipulations; and as it appeared that the county officials had delivered to the board the whole amount of the bonds demanded, and that this amount was ample for the fulfilment of the obligations contracted for, the suit could not be maintained. The decree was, therefore, reversed and the bill dismissed, but *without prejudice*, — a condition which prevented the adjudication from operating as a bar to the same claim, if the complainants could in another suit obviate the defects of the existing bill. In the present suit they have obviated these defects. They allege and prove that the harbor board had disposed of all the bonds it had received before the passage of the act of April 19, 1873, restricting the number to be issued, and that it had turned over to the officials of the county neither bonds nor proceeds to meet the demand of the complainants. The two suits, though seeking the same relief, rest upon a different state of facts, and the adjudication in the one constitutes, therefore, no bar to a recovery in the other.

4. But it is finally objected that the case presented by the bill is not one for the cognizance of a court of equity. This objec-

tion is important only from the supposed effect of the decision
of the Supreme Court of the State in the first suit against the
county brought by the complainants. It appears to have been
taken for granted by counsel, and also by the court below, that
the Supreme Court of the State had decided that the harbor
board was not the agent of the county in making the contract
with the complainants. We do not so read its opinion. It
only says that the board was created by the General Assembly
of the State, and was not an agent *appointed* by the county of
Mobile. It does not state that the board was not an agent of
the county, but only that its appointment was not from the
county, and that it drew its existence and authority from the
statute of the State. It is not necessary to constitute an agency
of a political subdivision of a State that its officials should be
elected by its people or be appointed with their assent. It is
enough to give them that character that, however appointed,
they are authorized by law to act for the county, district, or
other political subdivision. Here, the harbor board, created
by a law of the State, was authorized to make contracts for a
public work in which the county was specially interested, and
by which it would be immediately and directly benefited, and to
require obligations of the county to meet the expenses incurred.
It is a mere battle of words to contend that it was, or was not,
an agent of the county because its members were appointed by
some exterior authority. It is enough in this case that by
force of the law of its creation it could bind the county for
work for which it contracted. Having thus bound the county,
the contractors are entitled to the bonds stipulated, or their
equivalent in money. If for any cause, the repeal of the law
creating the harbor board, or the refusal of its members or other
officials to act, the contract cannot be specifically enforced, a
court of equity will order compensation in damages from the
party ultimately liable. That court will free the case from all
technical embarrassments, to the end that justice may be done
to those who have trusted to the law, and the responsibility
of parties receiving benefits under it. The case here is not
different in principle from the ordinary case of a party being
unable to comply with his contract when specific performance
is demanded. If, for example, there be a contract for the pur-

chase of land with which the purchaser has complied, but in which the vendor has failed, a court of equity will take jurisdiction; and if it be seen that the vendor, from subsequent sales or otherwise, cannot comply with a decree for a specific performance, the court will adjudge compensation in damages. So here, the court will grant the relief which the complainants, under their contract, are entitled to have, if such relief can be obtained from the county; but if by reason of intervening obstacles since the contract was made whether arising from laches or default of its officials or repealing legislation, this cannot be secured, an alternative and compensatory decree, that is, one for a money equivalent in the form of damages, will be directed. And as this has been done in the present case, the decree is

*Affirmed.*