PITTSBURGH, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY *v.* THE STATE OF INDIANA.

[No. 21,217.    Filed April 9, 1909.]

1. STATUTES.— *Construction.*— *"And."*— *Railroads.*— *"Full Crew" Law.*—The word "and," as used in §5297 Burns 1908, Acts 1907, p. 18, §3, providing that any railroad company which sends out a train "not manned in accordance with sections 1 and 2 of this act," shall be guilty of a misdemeanor, should be read as "or." p. 157.

2. STATUTES.—*Penal.—Construction.*—The strict construction rule, while applicable to penal statutes, will not be permitted to defeat the evident intent of the legislature, and where "and" was used where "or" was plainly intended it will be read as though "or" were used.    p. 159.

3. STATUTES.—*Construction.—Railroads.—"Full Crew" Law.—Violation.*—Under §5295 Burns 1908, Acts 1907, p. 18, §1, making it a misdemeanor for any railroad company "to operate over its road or any part thereof" a freight-train without a certain number of employes, and §5296 Burns 1908, Acts 1907, p. 18, §2, making it a misdemeanor for any such company "to run over its road or any part of its road" any passenger- mail- or express-train without a certain number of employes, and §5297 Burns 1908, Acts 1907, p. 18, §3, providing that any railroad company "who shall send out on its road" any train not so equipped, shall be guilty of a misdemeanor, a railroad company starting a mail train from Jersey City, New Jersey, destined for Indianapolis, Indiana, while running the same through Indiana is guilty of such offense.    p. 160.

4. CONSTITUTIONAL LAW.— *Railroads.*— *State Regulation.*— *Interstate Commerce.*—The act of 1907 (Acts 1907, p. 18, §§5295-5298 Burns 1908) making it "unlawful for any railroad company doing business in the State of Indiana" to operate a train without a full crew, applies only to intrastate commerce, and is not an attempted regulation of interstate commerce.    p. 161.

5. CONSTITUTIONAL LAW.—*Interstate Commerce.—Police Power.*— States have no right, under the police power, directly to burden

or regulate foreign or interstate commerce, but state legislation which only incidentally affects such commerce may be sustained. p. 162.

6. CONSTITUTIONAL LAW.—*Police Power.—Absence of Federal Legislation.*—State statutes, where no federal legislation has been enacted on the subject, safeguarding the persons engaged, and property used, in interstate commerce, are generally considered with favor by the courts. p. 163.

7. CONSTITUTIONAL LAW.—*Railroads.—"Full Crew" Law.—Interstate Commerce.*—The Indiana "full crew" act (Acts 1907, p. 18, §§5295-5298 Burns 1908) is not invalid on the grounds that congress has the exclusive right to legislate regarding interstate commerce, and that its failure to legislate upon such subject prevents the states from legislating thereon. p. 164.

8. CONSTITUTIONAL LAW.—*"Full Crew" Law.—Federal Statutes.*—The Indiana "full crew" act (Acts 1907, p. 18, §§5295-5298 Burns 1908) is not invalid on the ground that congress has legislated in respect to the safety of those engaged in interstate commerce, there being no federal statute prescribing the number of employes necessary to operate trains. p. 166.

9. CONSTITUTIONAL LAW.—*"Full Crew" Law.—Post-Roads.—Police Power.*—The Indiana "full crew" act (Acts 1907, p. 18, §§5295-5298) is not invalid, as to a train carrying the United States mail, on the ground that congress has the exclusive power to regulate post-offices and post-roads. p. 167.

10. CONSTITUTIONAL LAW.—*Safety of Trains.—"Full Crew" Law. —Police Power.*—The legislature has the right to safeguard passengers and employes on trains by compelling railroad companies to provide sufficient crews therefor, though extra expense to the companies be necessary. p. 168.

From Criminal Court of Marion County (36,256); *William Irvin*, Special Judge.

Prosecution by The State of Indiana against the Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company. From a judgment of conviction, defendant appeals. *Affirmed.* (Appealed to United States Supreme Court, see — U. S. —.)

*Samuel O. Pickens* and *Owen Pickens*, for appellant.

*James Bingham*, Attorney-General, *Martin Hugg*, *William H. Thompson*, *Edward M. White* and *Alexander G. Cavins*, for the State.

JORDAN, C. J.—The State of Indiana instituted this prosecution by affidavit against appellant for a violation of the provisions of an act of the General Assembly approved February 13, 1907 (Acts 1907, p. 18, §§5295-5298 Burns 1908), known as the "full crew act." The title of the act is: "An act entitled an act concerning railroads and to better protect the lives of railway employes and the traveling public, and providing penalties for the violation thereof." Omitting the enacting clause, the statute in question is as follows: "Section 1. That it shall be unlawful for any railroad company doing business in the State of Indiana, that operates more than four freight-trains in every twenty-four hours, to operate over its road or any part thereof, or suffer or permit to be run over its road outside of the yard limits, any freight-train consisting of more than fifty freight- or other cars, exclusive of caboose and engine, with less than a full train crew, consisting of six persons, to wit: One conductor, one engineer, one fireman, two brakemen and one flagman (such flagman to have had at least one year's experience in train service), and it shall be unlawful for any such railroad company that operates more than four freight-trains in every twenty-four hours, to run over its road, or any part thereof, outside of the yard limits, any freight-train, consisting of less than fifty freight-cars or other cars, exclusive of caboose and engine, with less than a full crew for such a train, consisting of five persons, to wit: One conductor, one engineer, one fireman, one brakeman and one flagman: Provided, however, that a light engine without cars shall have the following crew, to wit: One conductor, one flagman, one engineer and one fireman.

"Section 2. That it shall be unlawful for any railroad company doing business in the State of Indiana to run over its road or any part of its road, outside of yard limits, any passenger-, mail- or express-train, consisting of five or more cars, with less than a full passenger crew, consisting of one engineer, one fireman, one conductor, one brakeman and one

flagman (said brakeman or flagman shall not be required to perform the duties of baggage masters or express messengers).

"Section 3. That any railroad company doing business in the State of Indiana, who shall send out on its road, or cause to be sent out on its road, any train which is not manned in accordance with sections one and two of this act, shall be guilty of a misdemeanor, and upon conviction shall be fined not less than $100 nor more than $500 for each offense, and such company shall be liable for any damages caused by the violation of any of the provisions of this act.

"Section 4. It shall be the duty of the board of railroad commissioners to have this law enforced."

The affidavit upon which the prosecution rests is in two counts. The first charges that appellant railway company "is, and was at the times hereinafter stated, a railway company duly incorporated under and pursuant to the laws of the State of Indiana, and was then and there engaged in doing business as such in the State of Indiana, and was then and there operating its road in and from the city of Indianapolis, Marion county, Indiana, eastward through said county, and thence through the counties of Hancock, Henry and Wayne, in said State, to the eastern boundary of said State, and from thence to the city of Columbus, in the state of Ohio; that it was then and there running over its said road, from said city of Columbus to and in said city of Indianapolis, a mail-train, consisting of five and more cars, known as train No. 11, carrying the mails of the United States of America for hire; that on or about April 24, 1907, defendant did then and there operate and run over its said railway its said mail-train No. 11, consisting of five and more mail-cars, to wit, seven mail-cars, carrying thereon for hire the mails of the United States of America, and did then and there carry for hire the mails of the United States on said train from Columbus, Ohio, to the eastern boundary line of Indiana, and thence westward over its said railway through the counties

of Wayne, Henry and Hancock, in the State of Indiana, to the eastern boundary line of said Marion county to and in said city of Indianapolis, and did then and there run and operate its said mail-train from said city of Columbus on, over and along its said railroad to the eastern boundary line of the State of Indiana, and from thence unlawfully ran and operated its said mail-train westward through said counties of Wayne, Henry and Hancock to the eastern boundary line of said Marion county, and from thence unlawfully ran and operated its said mail-train to and in said city of Indianapolis with less than a full passenger crew in charge of, caring for, and operating its said mail-train, and the defendant did then and there unlawfully run and operate its said mail-train on, over and along its said railway from said eastern boundary line of the State of Indiana to the eastern boundary line of said Marion county, and did then and there unlawfully send out, run and operate its said train on, over and along its said railway from said eastern boundary line of said Marion county to and in said city of Indianapolis, in said Marion county, with only the following crew in charge of, caring for, and operating its said mail-train, to wit: One engineer, one fireman, one conductor and one brakeman, and that the defendant did then and there unlawfully send out, run and operate its said mail-train on, over and along its said railway in said Marion county without having as part of its said crew a flagman, contrary to the form of the statutes," etc.

The second count is virtually the same as the first, except that therein it is alleged that the crew of the train in question was composed of one engineer, one fireman, one conductor and one flagman, there being no brakeman in said crew. Defendant filed a written motion to quash each of the counts, for the following reasons: "That the facts stated in said count of the affidavit do not constitute a public offense: (1) That the act of the General Assembly of the State of Indiana, entitled 'An act entitled an act concerning rail-

roads, and to better protect the lives of railway employes and the traveling public, and providing penalties for the violation thereof,' approved February 13, 1907, being chapter eleven of the acts of the sixty-fifth session of said General Assembly, is void so far as it affects the regulation, operation and control of said train known as No. 11, described in said count of the affidavit, in that said act is in violation of article 1, §8, of the Constitution of the United States, and the laws of the United States made thereunder and in pursuance thereof. (2) That section three of said act, attempting to provide a penalty for the violation of the provisions of said act, is illegal and void, because it prescribes no penalty for the violation of any of the provisions of the first or second sections of said act, taken severally and separately, as to a train's running in violation thereof, but prescribes a penalty only where a train is sent out on the road of a railroad company which is not manned in accordance with both sections one and two of said act; the crew prescribed for a train by the first section of said act being different from the crew prescribed for a train by the second section of said act.''

The motion to quash the second count of the affidavit is predicated upon the same grounds as is that to quash the first. This motion to quash was overruled, and appellant excepted. It waived arraignment, and pleaded not guilty, and also filed a special plea to each count. This plea, omitting the formal parts, is as follows: ''The defendant, Pittsburgh, Cincinnati, Chicago and St. Louis Railway Company, for its special plea to the first count of the affidavit herein, says that at all times mentioned in said count of said affidavit said defendant was a corporation legally organized and existing under the laws of the states of Pennsylvania, West Virginia, Ohio, Indiana and Illinois, and owned and operated a line of railway extending from the city of Pittsburg, in the state of Pennsylvania, westwardly through the states of West Virginia and Ohio, and through the city of Columbus, in the state of Ohio, to the city of Indianapolis, in the

State of Indiana, and connecting at the city of Pittsburg with a line of railway extending eastwardly through the states of Pennsylvania and New Jersey to the city of New York, in the state of New York, and connecting at the city of Indianapolis with a line of railway extending westwardly through the states of Indiana and Illinois to the city of St. Louis, in the state of Missouri; that during said times the defendant owned and was operating over its said line of railroad from said city of Pittsburg to said city of Indianapolis said mail-train described in said count of said affidavit, known as train No. 11, which consisted of from five to seven United States postal-cars, which train carried no passengers, but was engaged exclusively in carrying the United States mails under contract between the postoffice department of the United States and the defendant; that on April 24, 1907, the defendant did then and there operate and run over its said railway said mail-train No. 11, consisting of seven United States postal-cars, carrying thereon for hire, under said contract, the United States mails, but carrying no passengers, from the city of Pittsburg, through the city of Columbus, to the eastern boundary line of the State of Indiana, and thence westwardly over its said railway through the counties of Wayne, Henry and Hancock in the State of Indiana, to the eastern boundary line of the county of Marion, in the State of Indiana, and thence to and into the city of Indianapolis, as alleged in said count of said affidavit; that said train when so run was in charge of a crew of men consisting of one engineer, one fireman, one conductor, and one flagman; that the locomotive pulling said train was properly equipped with driving-wheel brakes, and each of said cars of said train was properly equipped with automatic couplers and continuous brakes, as required by the act of congress of March 2, 1903 (32 Stat. 943), known as the 'safety appliance act'; that said driving-wheel brakes, automatic couplers, and continuous brakes were on said date in perfect condition and service for the control of

the movement and operation of said train, and by which the movement and operation of said train was then and there at all times under complete and perfect control; that said crew in charge of said train was able to and did perform every duty and service requisite for the safety of said train, and for the property and the employes thereon, and also for the safety of all other trains operated upon said railway, for the property and employes thereon, and the traveling public carried upon said trains, and for the safety of all other railroad trains and persons and property carried thereon, and of all other persons and property; that a brakeman or any other additional employe upon said train would have been useless and wholly unnecessary; that if such brakeman or other additional employe had been employed upon said train his presence thereon would not have added to the safety of said train, nor better protected the lives of railway employes or the traveling public than they were protected by the services of said crew in charge of said train as aforesaid, but, on the contrary, would have tended to the unsafety of said train, and added to the danger of the lives of railway employes and the traveling public, by reason of the fact that such additional employe would have had no duty to perform in connection with the operation of said train, and would have caused a division of responsibility between said crew and said additional employe, and would have had the effect of relaxing the vigilance of the employes in charge of said train; that the employment of such additional employe upon said train would have added a burden of about $65 per month to the cost of operating said train, without any profit or benefit whatever to the defendant, its employes, or to the traveling public; that the act of the General Assembly of the State of Indiana, entitled 'An act entitled an act concerning railroads and to better protect the lives of railway employes and the traveling public, and providing penalties for the violation thereof,' approved February 13, 1907 [Acts 1907, p. 18, §§5295-

5298 Burns 1908], is void in so far as it affects the regulation, operation and control of said train No. 11, described in said count of said affidavit, in that said act is in violation of article 1, §8, of the Constitution of the United States, and the laws of the United States made thereunder and in pursuance thereof. And defendant avers that the alleged offense charged in said count of said affidavit is the same as the acts alleged in this plea, and not otherwise. Wherefore said defendant prays that it stand acquit and go hence without day.''

That part of the special plea directed against the second count of the affidavit is the same as that pleaded to the first count. The reply of the State to this special plea was a general denial. The cause was submitted to the court for trial, and the defendant was found guilty as charged in the affidavit. It moved for a new trial, alleging as reasons therefor the statutory grounds. This motion was overruled and exceptions reserved. Defendant then moved in arrest of judgment. This motion was denied. The court then rendered judgment that the defendant be fined in the sum of $100, and that the State of Indiana recover of it said sum. From this judgment defendant has appealed, and predicated error upon the ruling of the court in denying its motion to quash each count of the affidavit and in overruling its motions for a new trial and in arrest of judgment.

The contentions of appellant's learned counsel in respect to the statute in controversy are expressed as follows. They argue: (1) That, ''as it affects the operation and control of the train described in the affidavit, the act is void, in that it is a regulation of, and an improper and illegal interference with, interstate commerce, and in violation of article 1, §8, of the Constitution of the United States, and in contravention of the statutes of the United States made thereunder and in pursuance thereof. (a) The power to regulate interstate commerce carried on interstate railway trains is vested in congress exclusively. (b)

The nonexercise of the power by congress in respect to a subject to which the power applies, and which is national in its character, or of such a nature as to admit of uniformity of regulation, is equivalent to a declaration that the subject shall be free from state interference. (c) The power to regulate is the power to govern; to prescribe the rules by which commerce shall be conducted; to declare when it shall be burdened with conditions, and when it shall be free and untrammeled. (d) The power also embraces within its control all the means, appliances, facilities and instrumentalities by which such commerce may be conducted. (e) Every obstacle to or burden laid upon interstate commerce by legislative authority is regulation. (f) The act under consideration as applicable to the train in question is an improper and illegal interference with the rights of appellant in conducting interstate commerce. (g) The act under consideration cannot be construed to apply only to intrastate trains. (2) That, so far as the act in question affects the train described in the affidavit, it is void, for the reason that it contravenes that clause of article 1, §8, of the Constitution of the United States which gives congress power to establish post-offices and post-roads, and the laws of congress enacted thereunder. This power of congress is exclusive and supreme. (3) The act is void for uncertainty, because the penalty is imposed for violating both sections one and two. (4) The manner in which the train was manned is not an offense within the penalty section of the act.'' (5) It is further insisted and argued that congress has already entered the field and legislated in respect to the safety of employes and passengers upon interstate railway trains, and in support of this contention counsel point to the following acts of congress to promote the safety of employes and travelers upon railroads, by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers: The act of 1903 (32 Stat. 943), amending the safety appliance act of 1893

(27 Stat. 531); the act of 1898 (30 Stat. 424), relating to the adjustment of controversies between railroad companies engaged in interstate commerce and their employes; the act of 1901 (31 Stat. 1446), requiring common carriers engaged in interstate commerce to make full reports to the interstate commerce commission of all accidents to passengers and employes; the act of 1906 (34 Stat. 1415), to promote the safety of employes and travelers, by limiting the hours of service on trains of railroad companies engaged in interstate commerce; the "Hepburn act" of 1906 (34 Stat. 584), authorizing the interstate commerce commission to require annual reports from all railroad companies engaged in interstate commerce, showing the number of employes, their salaries, etc.; the joint resolution of June 30, 1906 (34 Stat. 838), directing the interstate commerce commission to investigate and report on the use of and necessity for block signal systems, appliances, etc.

Counsel say that "in view of this legislation by congress and the comprehensive authority exercised by it over the operation and control of interstate railways by the provisions of the 'Hepburn act,' the statute under consideration contravenes the statutes of congress enacted under the commerce clause of the Constitution." It is insisted that the mere fact that congress has not seen fit to prescribe any specific rule with respect to the number of men required to man interstate trains does not affect the question that its inaction on this particular feature of the subject is without significance in view of its legislation with respect to safety appliances upon engines and cars of interstate trains, limiting the hours of service of employes, etc.

In addition to the constitutional objections urged, the validity of the statute is assailed on the ground that an uncertainty arises out of the penalizing provisions

1. of section three (§5297, *supra*). It will be noted that this section provides that "any railroad company * * * who shall send out on its road, * * *

any train which is not manned in accordance with sections one and two of this act, shall be guilty of a misdemeanor and upon conviction shall be fined,'' etc.   It is argued that by reason of this clause there can be no conviction unless the offending company has been guilty of violating at the same time and by the same act both sections one and two of the act.   It is true that section three, in this respect, is not aptly drafted and is open to criticism, but a consideration of the provisions of the statute fully reveals the fact that it was not the sense or intent of the lawmakers so to unite the provisions of section three that there could be no prosecution under the law unless the offending company was guilty of violating conjointly sections one and two (§§5295, 5296, supra), by running over its road, at the same time and as a concurrent act, a freight-train not manned as required by the first section of the statute, and also a passenger- mail- or express-train not equipped with a crew as exacted by section two.   To construe the statute to the effect that a railroad company could not be convicted thereunder without charging in the indictment or affidavit, as the case might be, and proving upon the trial, that it, by the same act, had violated the two sections in question, would be absurd and against the plain intent of the legislature. The conjunction ''and,'' as used in the phrase ''sections one and two of this act,'' was evidently intended to be disjunctive, and will be so interpreted in order to carry out the legislative meaning or intent.   State v. Myers (1896), 146 Ind. 36, 38, and authorities cited.

In this latter case we said:   ''It is a well-recognized canon of interpretation by which courts are guided in the consideration of statutes, that where the legislative sense is plain, the exact grammatical construction and propriety of language may be disregarded.   In obedience to this rule, courts have frequently interpreted 'and' as meaning 'or,' and vice versa''—citing authorities.   See, also, the fol-

lowing cases, which sustain the same rule: *State* v. *Gerhardt* (1896), 145 Ind. 439, 467, 33 L. R. A. 313; *State* v. *Cain* (1876), 9 W. Va. 559; *Streeter* v. *People* (1873), 69 Ill. 595; *State* v. *Myers* (1860), 10 Iowa 448; *State* v. *Smith* (1877), 46 Iowa 670.

But counsel for appellant insist that inasmuch as a railroad company, which does not comply with the provisions of the statute, is subjected to a penalty, therefore, the 2. act must be strictly construed, and the word "and" in question cannot be interpreted or construed to mean "or." While it is true, as a general rule, that penal statutes are to be strictly construed, nevertheless appellant cannot invoke the application of this rule to defeat the intent of the legislature, for the rule is as applicable to penal statutes as it is to others. *City of Indianapolis* v. *Huegele* (1888), 115 Ind. 581; *Douglass* v. *State* (1897), 18 Ind. App. 289; *State* v. *Smith, supra; State* v. *Brandt* (1875), 41 Iowa 593; *Foster* v. *Commonwealth* (1844), 8 Watts & Serg. 77; *People* v. *Lytle* (1896), 40 N. Y. Supp. 153, 161; *People* v. *Sweetser* (1876), 1 Dak. 308, 46 N. W. 452; *United States* v. *Wight* (1889), 38 Fed. 106, 107; *Ex parte Chin Yan* (1882), 60 Cal. 78, 84; Endlich, Interp. of Stat., §305.

In *State* v. *Smith, supra,* the court, in considering whether the word "and," in the statute there involved, should be treated as a disjunctive, used in the sense of "or," said: "Penal statutes are to be construed strictly. By this is meant only that they are not to be so extended by implication, and beyond the legitimate import of the words used, as to embrace cases or acts not clearly described by such words. They are not to be made to involve an absurdity, or frustrate the design of the legislators." It follows, under the circumstances and authorities herein cited, that the word "and," as used in section three (§5297, *supra*), should be interpreted as "or," and when so interpreted it is apparent that the intent of the legislature was that any rail-

road company which violated the provisions of either of the sections should be guilty of a misdemeanor and subjected to the penalty prescribed.

The argument is further advanced that the provisions of section three (§5297, *supra*) condemn only a railroad company which sends out on its road any train, etc.

3. , Counsel assert that "there is no provision that the railroad company shall be guilty of a misdemeanor and subject to a penalty for running a train over its road." It is argued that the evidence shows that the train in question ran from Jersey City to Indianapolis and beyond the latter city. Therefore, it is claimed that the train was not sent out within the State of Indiana. While it may be true that the initial starting or movement of the train on its trip westward was at Jersey City, nevertheless it appears from the evidence that it was operated by appellant company over its railroad in the city of Indianapolis, Marion county, Indiana, outside of yard limits, and through other counties in said State, without being equipped with a crew as required by section two of the act. It will be observed that each of sections one and two (§§5295, 5296, *supra*) defines an offense, and for a conviction of either offense the penalty as fixed is incurred. It will be noted that section one (§5295, *supra*) declares that "it shall be unlawful for any railroad company doing business in the State of Indiana, * * * to operate over its road or any part thereof, or suffer or permit to be run over its road outside of the yard limits, any freight-train," etc. Section two (§5296, *supra*) declares it to be unlawful "for any railroad company doing business in the State of Indiana to run over its road or any part of its road, outside of yard limits, any passenger- mail- or express-train," etc., without being equipped with the crew as therein provided. Construing the provisions of these two sections along with those of section three (§5297, *supra*), and it is evident that the phrase "send out on its road," as used in the latter section, was employed

in the sense of "to operate" or "run over its road," as the same is used in sections one and two in defining the respective offenses. Upon the supposition that the statute is valid, as against the objections urged by appellant, it therefore follows from the construction which we accord to the law that any railroad company doing business in Indiana, which operates over its road or any part thereof, in this State, or which suffers or permits to be run over its said road, outside of yard limits, any freight-train, in violation of the provisions of section one, or any railroad company doing business in the State, which runs over its road, or any part thereof, within this State, outside of yard limits, any of the trains designated in section two, in violation of that section, is in either case guilty of a misdemeanor, as declared in the statute, and upon conviction is subject to the penalty therein prescribed.

As heretofore shown, appellant's counsel claim that the statute in question is invalid: (1) Because it is an illegal interference with interstate commerce, and there-

4. fore violative of article 1, §8, of the Constitution of the United States, which section, among other things, invests congress with the power "to regulate commerce with foreign nations, and among the several states." (2) That, so far as this statute affects the train which appellant company was charged with, and convicted of, operating in violation of the statute, it is void, because it contravenes the provisions of article 1, §8, supra, whereby congress is invested with the power to establish post-offices and post-roads; and for the further reason that it is antagonistic to the laws of congress, enacted under the aforesaid provision of the federal Constitution. As the statute presents itself to us, there appears to be no room for asserting that it cannot be so construed as to apply only to intrastate trains. In fact, it may be asserted that the act only professes to apply to and control railroad companies doing

business within the State of Indiana, operating over their roads the trains designated. We cannot assume that the legislature, in passing this law, intended to exceed its power, but, on the contrary, we must presume that the legislative department knew when it enacted the statute that its provisions could not be extended so as to have any force or effect beyond the limits of this State. The act was passed by the legislature under the police power of the State, and we discover nothing in its provisions which can be said to afford grounds for an argument that it is an attempt on the part of the State, through its legislature, to regulate interstate commerce. It contains no restrictions in respect to persons or things which are carried by the trains in question, no regulations of fares or freights to be exacted by the railroad companies; in fact, its object, as the title discloses, is "to better protect the lives of railway employes and the traveling public." It is true that the police power cannot be legitimately exercised by a state so as substantially to prohibit or unnecessarily burden either foreign or interstate commerce, but the interference, if any, in the exercise thereof, with the commercial power of the federal government, in order to be unlawful, must be direct, and not the mere incidental effect of the enforcement of such power by the state. Even if it could be said that this statute, in its operation, affects interstate commerce only indirectly and remotely, it would nevertheless be a valid exercise by the State of its legislative power. *Smith* v. *Alabama* (1887), 124 U. S, 465, 8 Sup. Ct. 564, 31 L. Ed. 508; *Hennington* v. *Georgia* (1896), 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166; *Hall* v. *De Cuir* (1878), 95 U. S. 485, 24 L. Ed. 547; *Gloucester Ferry Co.* v. *Pennsylvania* (1884), 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; *Chicago, etc., R. Co.* v. *Solan* (1898), 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688; *Austin* v. *Tennessee* (1900), 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; *Field* v. *Bar-*

Pittsburgh, etc., R. Co. *v.* State—172 Ind. 147.

*ber Asphalt Pav. Co.* (1903), 194 U. 'S. 618, 24 Sup. Ct. 784, 48 L. Ed. 1142; *Pittsburgh, etc., R. Co.* v. *City of Hartford City* (1908), 170 Ind. 674; Calvert, Regulation of Commerce, 91, 92, and authorities cited; Russell, Police Powers, 149, 150; *Chicago, etc., R. Co.* v. *State* (1908), 86 Ark. 412, 111 S. W. 456.

In *Pittsburgh, etc., R. Co.* v. *City of Hartford City, supra,* we held that, so long as congress does not intervene, railroad corporations are subject to reasonable local regulations, even though incidentally affecting interstate commerce.

There are many cases, as the authorities affirm, where the police power of the state can be properly exercised to insure a faithful and prompt performance of duty,
6. within the limits of the state, upon the part of railroad companies, or other common carriers engaged in interstate commerce. This is especially true in respect to laws enacted by the state for the safety of persons and property. Such regulations are rather to be regarded as legislation in aid of commerce, and are generally considered with special favor by the courts. *Chicago, etc., R. Co.* v. *Solan, supra; Missouri, etc., R. Co.* v. *Haber* (1898), 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878.

In *Chicago, etc., R. Co.* v. *Solan, supra,* the court said: "Railroad corporations, like all other corporations and persons, doing business within the territorial jurisdiction of the state, are subject to its law. It is the law of the state, that provisions are to be found concerning the rights and duties of common carriers of persons or of goods, and the measure by which injuries resulting from their failure to perform their obligations may be prevented or redressed. Persons traveling on interstate trains are as much entitled, while within the state, to the protection of that state, as those who travel on domestic trains."

The contention of appellant's counsel is that by the passage of this statute the State has entered a class over which

congress has the exclusive power to legislate; there-
7.  fore they argue that the silence of congress or the
nonexercise of its power alone prohibits the State
from entering and legislating in respect to matters embraced
within such class.  From the viewpoint of appellant's coun-
sel the claim in respect to the nonaction of congress is true,
and a well-settled proposition.  *Covington, etc., Bridge Co.*
v. *Kentucky* (1894), 154 U. S. 204, 14 Sup. Ct. 1087, 38 L.
Ed. 962; *Gulf, etc., R. Co.* v. *Hefley* (1895), 158 U. S. 98,
15 Sup. Ct. 802, 39 L. Ed. 910; Judson, Interstate Com-
merce, §§22, 23.  But the fact is that the statute here in-
volved does not legislate upon a subject over which congress
has exclusive power to legislate.  The subject-matter em-
braced in the statute is not of such a national character as
to require uniform regulation or legislation applicable alike
to all states, so as to make the power of congress thereover
exclusive.  But the act here in controversy is confined to
the state in its operation, and may be permitted to stand
until congress sees fit to enter the field and actually legis-
late upon the precise subject-matter, in which event the
statute in question would have to yield.  It more properly
belongs to a class in which the power of the state to legislate
in respect thereto is concurrent with the federal government,
or, in other words, to a class into which either the state or
the federal government has authority to enter and legislate
upon the precise subject-matter, but where the act of the
state, in case of actual legislation by congress, would be com-
pelled to yield to such federal legislation, in case of a direct
conflict between the two acts.  *Smith* v. *Alabama, supra;
Missouri, etc., R. Co.* v. *Haber, supra; Pacific Coast Steam-
ship Co.* v. *Board, etc.* (1883), 18 Fed. 10; *State, ex rel.,* v.
*Adams Express Co.* (1908), 171 Ind. 138, and cases there
cited.

In *Smith* v. *Alabama, supra,* the court said:  "It is among
these laws of the states, therefore, that we find provisions
concerning the rights and duties of the common carrier of

persons and merchandise, whether by land or by water, and the means authorized by which injuries resulting from the failure properly to perform their obligations may be either prevented or redressed.   *   *   *   The failure of congress to legislate can be construed only as an intention not to disturb what already exists, and is the mode by which it adopts, for cases within the scope of its power, the rule of the state law, which until displaced covers the subject.''

The nonaction of congress in respect to the legislation upon the precise subject-matter of the statute in this case may be regarded as the equivalent of the declaration by that body that, until it sees proper to legislate thereon, the matter may be regulated by the authority of the state.  *County of Mobile* v. *Kimball* (1880), 102 U. S. 691, 698, 26 L. Ed. 238; *Chicago, etc., R. Co.* v. *Solan, supra.*

In *County of Mobile* v. *Kimball, supra,* the court said: ''The uniformity of commercial regulations, which the grant of congress was designed to secure against conflicting state provisions, was necessarily intended only for cases where such uniformity is practicable.  Where from the nature of the subject or the sphere of its operation the case is local and limited, special regulations adapted to the immediate locality could only have been contemplated.  State action upon such subjects can constitute no interference with the commercial power of congress, for when that acts the state authority is superseded.  Inaction of congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the states and requiring uniformity of regulation, is not to be taken as a declaration that nothing shall be done with respect to them, but is rather to be deemed a declaration that for the time being, and until it sees fit to act, they may be regulated by state authority.''

In *Chicago, etc., R. Co.* v. *Solan, supra,* the court said: ''It is equally within the power of the state to prescribe the safeguards and precautions foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries,

which, after they have been inflicted, the state has the power to redress and to punish. The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits.''

There having been no actual legislation by congress upon the precise subject-matter covered by the act in question, therefore, until the happening of such an event, it must stand and control within this State unless repealed. But, as previously stated, appellant's counsel argue that congress has already entered the field of legislation for the safety of employes and passengers on interstate trains, and the fact that congress has not seen fit to prescribe any specific rules in regard to the number of men required to operate interstate trains does not affect the question. In support of this claim we are referred to the acts of congress requiring the cars of interstate trains to be equipped with automatic couplers, and other acts mentioned and set up by counsel, as hereinbefore stated. This argument, however, has been rejected by the Supreme Court of the United States. *Gulf, etc., R. Co.* v. *Hefley, supra; Missouri, etc., R. Co.* v. *Haber, supra.*

In the case last cited the court said: ''May not these statutory provisions stand without obstructing or embarrassing the execution of the act of congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the state is not to be regarded as inconsistent with an act

of congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together.'' The court, after referring to several decisions, further said: ''These cases all proceed upon the ground that the regulation of the enjoyment of the relative rights, and the performance of the duties, of all persons within the jurisdiction of a state belong primarily to such state under its reserved power to provide for the safety of all persons and property within its limits; and that even if the subject of such regulations be one that may be taken under the exclusive control of congress, and be reached by national legislation, any action taken by the state upon that subject that does not directly interfere with rights secured by the Constitution of the United States or by some valid act of congress, must be respected until congress intervenes.''

In *Gulf, etc., R. Co.* v. *Hefley, supra,* the court expressed itself as follows: ''Generally it may be said, in respect to laws of this character, that, though resting upon the police power of the state, they must yield whenever congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter.''

It certainly cannot be said that there is any direct conflict between the provisions of the statute in question and any of the acts of congress to which counsel refer and upon which they rely. This is manifestly true, because the provisions of the statute involved and the acts of congress in question do not cover the precise subject-matter. This, as affirmed by some of the decisions of the Supreme Court of the United States to which we have referred, is regarded as essential.

The contention of appellant's counsel, that the statute, so far as it concerns the mail-train here in question, interferes with the exclusive power of congress under article 1, §8, of the Constitution of the United States to regulate post-offices and post-roads, is not tenable. Counsel do not advise us in what respect or to what extent the

statute interferes with the power of congress to regulate post-offices or post-roads, or the carriage of United States mail upon this particular train. The mere authority of railroad companies, under federal laws, to carry United States mail does not prohibit or abrogate any reasonable police regulations of the state. *Lake Shore, etc., R. Co.* v. *Ohio* (1899), 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702. See, also, *Whitson* v. *City of Franklin* (1870), 34 Ind. 392.

In *Illinois Cent. R. Co.* v. *Illinois* (1896), 163 U. S. 142, 16 Sup. Ct. 1096, 41 L. Ed. 107, the court held that a statute of the state of Illinois, requiring a railroad company to stop its mail-train at Cairo, was an undue interference with the carriage of United States mail. In passing upon the question, however, the court said: "It may well be, as held by the courts of Illinois, that the arrangements made by the company with the post-office department of the United States cannot have the effect of abrogating a reasonable police regulation of the state. But a statute of the state. which unnecessarily interferes with the speedy and uninterrupted carriage of the mails of the United States, cannot be considered as a reasonable police regulation."

Appellant further contends that this statute imposes upon it an unnecessary burden, by compelling it to employ an extra man in equipping its train. There was ample evidence introduced in the lower court to show the necessity for equipping appellant's train with the crew required by this statute, and to explain the duties necessary to be performed by each man constituting such crew. It is true that the train in question carried no passengers, but it carried postal clerks, and it was entirely competent for the legislature to require appellant to operate it in such a manner as reasonably to protect the safety of those aboard, and make its operation consistent with the safety of passengers carried on other trains running over appellant's road at the same time, either in the rear or in front of the train in controversy. Possibly the legislature, at the time it enacted this

statute, had before it the facts going to show the necessity therefor.  At least there is room for argument that the legislative department, in passing the statute, exercised a sound and honest discretion.  The law under the facts cannot justly be said arbitrarily to cast an unnecessary or unreasonable burden upon appellant without any corresponding benefit to its employes or the traveling public.

The constitutional validity of a statute of the state of Arkansas, requiring railroad companies to equip their freight-trains "with a crew consisting of an engineer, a fireman, a conductor and three brakemen, regardless of any modern equipment of automatic couplers and air-brakes," was recently sustained by the supreme court of that state, over substantially the same constitutional objections as are urged against the act here involved.  *Chicago, etc., R. Co.* v. *State, supra.*

The constitutional objections advanced by counsel cannot be sustained, and we uphold the validity of the act in question.  The evidence fully supports the judgment of conviction.  We find no error in the record.  The judgment is affirmed.