YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* KEYSTONE LUMBER COMPANY.

[43 South., 605.]

CARRIERS. *Railroads. Railroad commission. Rules. Demurrage. Delayage. Powers.*

> Under Code 1892, § 4291, giving the railroad commission power to fix charges and supervise persons owning or operating express, telegraph, telephone or sleeping car companies, and Laws 1898, p. 97, ch. 82, extending all laws authorizing the commission to supervise common carriers to car service associations:—
>
> (*a*) The railroad commission had power to make rules as to reciprocal demurrage; and
>
> (*b*) The rule of the commission is valid which provides that when cars are properly loaded and shipper's instructions given, the railroad company must immediately issue bills of lading to the shipper, making the company liable to a penalty of one dollar per day in the owner's favor for delay in starting the shipment, after twenty-four hours following the issuance of the bill of lading.

FROM the circuit court of Yazoo county.

HON. DAVID M. MILLER, Judge.

The lumber company, the appellee, was plaintiff in the court below; the railroad company, the appellant, was defendant there. From a judgment in plaintiff's favor for less than its demand, the defendant appealed to the supreme court, and the plaintiff prosecuted a cross-appeal.

The suit was to recover damages for the alleged unreasonable delay in the transportation of certain freight delivered to the

defendant for shipment. The defendant filed a special plea denying liability for delay, for the reason that the order of the railroad commission of the state of Mississippi attempting to create delayage charges is unconstitutional and void: (1) For the reason that neither under the Code nor the statute law enacted since its adoption is said railroad commission given the power to legislate and fix on railroad companies either penalties or fixed charges; (2) that the order of the railroad commission is arbitrary and oppressive, fixing a penalty on a railroad company and ignoring entirely the element of actual damage to the shipper; (3) that the order of the railroad commission is unconstitutional and void under the constitution of the state of Mississippi and of the United States, because it practically attempts to authorize the taking of property of the railroad company without due process of law.

The cause having originated in the court of a justice of the peace, where no pleadings were required to be filed, no action was had on this special plea, and the trial was proceeded with. When plaintiff introduced evidence to establish its delayage claims, objection was interposed by defendant to all testimony tending to support such claims or to fix liability on the railroad company therefor, which objections were overruled by the trial court on the ground that delayage charges became due for delay in transportation of car-load lots, and that plaintiff was entitled to recover therefor, but the court below disallowed all claims for less than car-load lots, and so instructed the jury.

The following are the demurrage and delayage rules adopted by the Mississippi Railroad Commission, June 8, 1904, and effective June 18, 1904:

"Rule 1. Railroad companies shall, within twenty-four hours after the arrival of shipments, give notice by mail or otherwise to consignees of arrival of goods, together with weight and amount of freight charges due thereon, and on goods in carload quantities said notices must contain letters or initials of the car, number of the car, and if transferred in transit, the

number and initial of the original car, net weight, and the amount of freight charges due on same. No demurrage charge shall be made unless legal notice of arrival is given to consignee.

"Any railroad company failing to give such notice, and to deliver such freight at its depots or warehouses, or, in case of shipment for track delivery, to place loaded cars at an accessible place for unloading, within twenty-four hours after arrival, computing from 7 a. m. the day following the arrival, shall forfeit and pay to the consignee, or other party whose interest is affected, the sum of $1 per car per day or fraction of a day on all car-load shipments, and one cent per one hundred (100) pound per day or fraction thereof on less than car-load lots, with a minimum charge of five cents for any one package, after the expiration of said twenty-four hours.

"Rule 2. Legal notice referred to in these rules may be either actual or constructive. Where the consignee is personally served with notice of the arrival of freight, free time begins at 7 o'clock a. m. on the day after such notice has been given. Constructive notice referred to consists of posting notice by mail to the consignee: provided, however, that if, in any case, where notice of arrival is given by mail, the consignee will make oath that neither he, his agents, nor employes have received such notice, then no demurrage charges shall be made until after legal notice as above specified, is given.

"Rule 3. For all package freight not unloaded in depot or warehouse by railroad company within forty-eight hours, not including Sundays or legal holidays, computing from 7 o'clock a. m. on day following arrival, the railroad company may be subjected by the consignee to a charge for each day or fraction of a day that said freight remains in a car as follows: In less than car-load quantities, not more than one cent per 100 per day; in car-load quantities, not more than ten cents per ton of 2,000 pounds per day.

"All package freight unloaded in depot and warehouse, which

is not removed by the owners thereof from the custody of the railroad company within forty-eight hours (not including Sundays or legal holidays), computed from 7 o'clock a. m. on the day following the day of legal notice of arrival, may be subject thereafter to a charge of storage for each day or fraction of a day that it may remain in the custody of the railroad company, as follows:

"In less than car-load quantities, not more than one cent per hundred pounds per day.

"In car-load quantities, not more than ten (10) cents per ton of two thousand (2,000) pounds per day.

"When consignee resides more than three miles and within ten miles of the railroad station, five days' free time will be allowed.

"When consignee resides more than ten miles from the railroad station, seven days' free time will be allowed.

"Rule 4. Loaded cars, which by consent and agreement between the railroad and consignee, that are to be unloaded by consignee, such as bulk meat, bulk grain, hay, cotton seed, lumber, lime, coal, coke, sand, brick, stone, and wood, and all cars taking track delivery, which are not unloaded from the cars containing same within forty-eight (48) hours (not including Sundays or legal holidays), computed from 7 o'clock a. m. of the day following the day legal notice of arrival is given, and the car or cars are placed accessible for unloading, may be subject thereafter to a charge of demurrage of one dollar per car for each day, or fraction of a day, that said car or cars remain loaded in the possession of the railroad company, it being understood that said car or cars are to be placed and remain accessible to the consignee for the purpose of unloading during the period in which held free of demurrage; that, when the period of such demurrage charges commence, they are to be placed accessible to the consignee for unloading purposes, on demand of the consignee: provided, however, that if the railroad company shall remove such car or cars after being so

placed, or in any way obstruct the unloading of the same, the consignee shall not be chargeable with the delay caused thereby: provided, further, that when any consignee shall receive four or more cars during any one day loaded with lumber, laths, shingles, wood, coal, coke, lime, ore, sand, or bricks, and all cars taking track delivery, the said cars in excess of three shall not be liable to demurrage by any railroad company until after the expiration of seventy-two hours.

"When consignee resides more than three miles and within ten miles of the railroad station, five days' free time will be allowed.

"When consignee resides more than ten miles from the railroad station seven days' free time will be allowed.

"Rule 5. When consignors ship goods to order, but express in their bills of lading the name of a person at destination to notify, it shall be the duty of the railroad company to give legal notice to such party in the same way and under the same rule as if the shipment had been made to him. But, when consignors do not comply with this condition, the notice may be addressed by mail to the consignee at point of delivery, and demurrage will begin as in other cases of notice by mail, and the mailing of such notice shall be sufficient legal notice, whether the consignee actually receives the same or not.

"Rule 6. Railroad companies are authorized to store such property in public warehouses at the expense of the owner, if same is not removed before demurrage charges attach: provided, that storage charges on such freight shall not exceed the demurrage allowed under their rules.

"Rule 7. Whenever the weather during the period of free time is so severe, inclement, or rainy that it is impracticable to secure means of removal, or where, from the nature of the goods, removal would cause injury or damage, such time shall be added to the free period, and no demurrage charges shall be allowed for such additional time.

"This rule applies to the state of the weather during business hours.

"Rule 8. Railroads shall not discriminate between persons or places in storage or demurrage charges. If a railroad company collects storage or demurrage of one person under the demurrage rules, it must collect of all who are liable. No rebate, drawback, or other similar device will be allowed.

"If demurrage is collected by a railroad company at one point on its line, it must collect at all of the places on its line, of those liable under the rules of this commission; provided, that the commission shall hear and grant applications to suspend the operation of this rule whenever justice shall demand this course.

"Rule 9. Whenever a shipper makes a verbal or written application to a railroad company for car or cars to be loaded with any kind of freight embraced in the tariff of said company, stating the article and destination, the railroad company shall furnish same within five days from seven (7) o'clock a. m. the day following such application. Or when the shipper making such application specifies a future day on which he desires notice thereof, computing from 7 o'clock a. m. the day following such notice, the railroad company shall furnish such car or cars on the day specified; provided, that if the movement of cars is suspended on account of accident or other cause not within the power of the railroad company to prevent, such period shall be added to the five days' time allowed in this rule.

"For failure to comply with this rule the railroad company shall pay to the shipper a delayage charge of $1 per car per day, or fraction thereof, after the expiration of free time, upon demand in writing in thirty (30) days thereafter.

"Rule 10. Cars detained or held on account of shipper's failure to load, or for want of proper shipping instructions, or by reason of improper loading, when loading is done by ship-

per, shall be subject to demurrage charges of $1 per car per day or fraction thereof, so detained.

"Shipper must be notified as soon as cars improperly loaded are received from him, in which case demurrage shall begin with notification.

"Likewise when cars are properly loaded, and shipping instructions given, the railroad agent must immediately issue bills of lading therefor; and if said car or cars are detained or held, and not carried forward within twenty-four (24) hours thereafter, said railroad company shall be liable to said shipper for the payment of $1 per car for each day, or fraction of a day, that said car or cars are thus detained or held.

"Likewise, where cars are detained in transit by being switched to some track between point of shipment and destination, $1 per car will be charged for each day or fraction of a day of delay thus caused, and no free time will in such case be allowed.

"Twenty-four hours' free time will be allowed for delay at the end of the freight division on which shipments originate, and a like period of twenty-four hours' free time for delivery to connecting lines on joint shipments, and a charge of $1 per car delayage shall be charged for each day or fraction thereof in excess of twenty-four hours same is held at such freight division or connecting point.

"Rule 11. No other charges shall be made for storage or demurrage, except as provided in the foregoing rules, and, if a railroad company is indebted to a shipper or consignee for delayage, then a claim for demurrage shall be offset by a claim for delayage.

"Rule 12. These rules apply only to places where car service rules are in operation.

"Rule 13. When both cars and track are owned by the same party, no charge for demurrage will be made. When private cars are detained on the tracks of other firms or individuals, or on the tracks belonging to or operated by members of this

association, or cars belonging to the latter upon private tracks, the established charge will apply.

"Rule 14. At junction points, where consignee's side track is located on one road and cars are received by a connecting road, it shall be the duty of the said connecting road to switch and deliver such cars to the road on which consignee's side track is located within twenty-four hours from 7 o'clock a. m. after the time of arrival, and of the road on which consignee's side track is located to switch and place such cars on said side track within twenty-four hours from 7 a. m. after the time of delivery by the receiving road. Failure in this regard shall subject either road to delayage charge of $1 per car per day or fraction thereof; provided, this shall not prevent the charge and collection of established or reasonable switching charges by the road on which said side track is located; and provided, further, that if said side track, without fault of the railroad, is blocked so that delivery cannot be made, the time it remains blocked shall be added to the free time specified herein.

" Rule 15. In all computation of time under these rules, Sundays and legal holidays are to be excluded."

*Mayes & Longstreet,* for appellant.

It needs little explanation to point out the essential difference between a demurrage charge and a so-called delayage penalty. This honorable court in two very notable decisions, has sustained the right to demurrage, and approved the purpose of the enforcement of demurrage charges. We deem it unnecessary to advert here to the principles which control in the assessment and collection of demurrage charges, and of the usefulness of car service associations along this line. These questions are extensively considered, and the reasons elaborately stated in *George* v. *New Orleans & N. E. R. R. Co.,* 82 Miss., 710, s.c., 35 South. Rep., 193; *Yazoo, etc., R. R. Co.* v. *Searles,* 85 Miss., 520, s.c., 37 South. Rep., 939.

The right in railroad companies to charge and collect de-

murrage exists independently of statutes. It is founded on the general principle of law that a warehouseman is entitled to charge for storage afforded and the liens of the railroad company for such charges are likened unto the liens which protect warehousemen.

In addition to this, the bills of lading stipulate as a part of the contract of affreightment, for demurrage charges and liens.

How different, however, is a delayage charge so called in its nature and operation; the demurrage charge is supported because something of value has passed from the railroad company to the consignee; that is the use of the car for storage purposes, but a delayage charge is a pure penalty attempted to be fixed on the railroad companies for the alleged fault of unreasonable delay in transportation without regard to the question of actual damage and additional to all claims for compensatory damages which are recoverable in proper cases.

In case of delay there is no valuable consideration passing from the consignee to the railroad company, no use or benefit from the possession of the commodity.

Our objection to the enactment by the railroad commission of any delayage charges, such as the charges and penalties provided for by said rules 9 and 10, are:

1. The railroad commission of Mississippi has no power under the law to create by legislation originating with it rights in consignees or shippers to demand penalties for freight delayed in transit or for actual damages occurring to freight in transit, and, therefore, all orders in the attempted enactment by that honorable body of such regulation are utterly void.

It will be observed that the right of a railroad company to demand demurrage for cars unnecessarily delayed and held for storage purposes, exists in railroad companies independently of statutes of states, or orders of railroad commissions. It exists under the principles of the common law, and is based on the idea universally recognized by the courts of the United States, that if the consignee delays a car and uses it for stor-

age purposes, the railroad companies have rights to compensation, and liens to secure payment for this use, akin to the rights and liens of warehousemen.

But no right exists, at common law or statute, in a consignee or shipper except to claim actual damages. If a carrier should do any wrong or fail in any obligation to a shipper or consignee, the law affords speedy and ample redress. But it will be observed that the commission did not provide that the penalty which they fixed should be accepted by shipper or consignee in satisfaction of actual damages. Consignees desire still to retain all their rights to sue for actual damages and the charges the commission attempted to enact gave rights additional to compensatory damages. By whatever name these charges may be styled, it is apparent that they are in the nature of pure penalties or fines which this commission has attempted to impose on the carrier.

If no right exists at law in a shipper or consignee to claim and to recover anything except actual damages they may have sustained by the wrongful actions of the carrier, and if he cannot recover penalties like those provided for without an order of the railroad commission, it is apparent at a glance, and needs no argument to show, that if they can claim these damages only after the commission makes an order allowing and fixing the penalties, then the order of the commission would create in a shipper or consignee the right to demand a penalty.

The order of the commission is the source and measure of the right to penalties and charges.

It is perfectly manifest that the railroad commission in order to create such a right must have specific and ample power to enact such legislation under the constitution and the laws of the state of Mississippi.

*Henry, Barbour & Henry,* for appellee.

Only a part of one of the rules fixed by the Mississippi railroad commission is involved in this case—not rules 9 and 10—

as distinguished counsel on the other side erroneously assert in their very able presentation of appellant's side of the controversy. The part involved is the following from rule 10: "Likewise when cars are properly loaded, and shipping instructions given, the railroad agent must immediately issue bills of lading therefor; and if said car or cars are detained or held, and not carried within twenty-four hours thereafter said railroad company shall be liable to said shipper for the payment of $1 per car for each day, or fraction of a day that said car or cars are thus detained or held."

The act upon which the validity of that part of the rule quoted must stand is ch. 82, p. 97, acts of Mississippi legislature of 1898, as follows: "That all laws, acts and parts of acts giving authority to the railroad commission to supervise common carriers shall also apply to car service associations or other associations governing or controlling cars or rolling stock of railroads at whatever place they do business in this state, and the same penalty fixed by law for disobeying the mandates of the railroad commission shall apply to the car service associations as well as to other carriers."

Manifestly, the railroad commission, in adopting the rules of June 8, 1904, effective June 18, 1904, were acting under the above law. It is also equally manifest that the rules were adopted with reference to the Car Service Association operating in Mississippi, and were deemed necessary for the efficient supervision of that association. It is certainly time (see rule 12) that the rules apply to places where car service rules are in operation.

Now, let us inquire for a moment the purpose of the creation of car service associations, very beneficent organizations, as the courts truly affirm. In *Yazoo, etc., R. R. Co.* v. *Searles,* 85 Miss., 556, s.c., 37 South. Rep., 939, the court on this subject tersely remarks: "The main end and purpose of their existence is to prove the benefit to *consignor, carrier* and *consignee* by *expediting* the *transportation of freight, facilitating*

*its delivery and insuring prompter and more satisfactory service
by and for all alike."*

It is therefore a mistake to assume as learned counsel seem
to do in their brief, that their chief end is to provide remuner-
ation to railroads on account of storage. The demurrage al-
lowed is but one of the means toward the end for which they
were called into being.

Learned counsel fall into another error when they say that
"by the act of February 11, 1898, the legislature gave the
railroad commission the power to regulate and supervise car
service associations and other associations controlling rolling
stock, and made car service associations, *insofar as the charges
which they would make* subject to the control of that honor-
able body. But that act only gives the commission the power
to regulate the charges which might be preferred by car service
associations." The erroneous conclusion of counsel is in the
part italicized. The legislature committed to the railroad
commission full and complete power to regulate and supervise
car service associations to effectuate the purposes for which
they were organized. Such car associations have no power to
fix demurrage charges. But the charges are fixed by the com-
mission, and then the duty of the car service associations in
this regard is to assess the charges. Thus speaks the supreme
court in the *Searles case,* p. 556: "They are in no wise con-
nected with the internal management, or financial affairs, or
corporate policy of any railroad, having not even power of
fixing demurrage charges which it is their duty to assess."

Again, on page 543 of the *Searles case,* referring to the act
of 1898, the court says: "Acting under the power thus vested
in it, the railroad commission adopted and promulgated cer-
tain rules in reference to demurrage charges, regulating the
amount which could be imposed, and setting out in detail the
circumstances under which they might rightfully be levied, and
then clothed the associations with authority to collect in all
proper cases. . . . It should be observed that these rules

fixing penalty for undue detention of cars were not devised for the benefit of the railroad companies alone, but were framed by the state railroad commission, a tribunal charged by law with the duty of supervising all common carriers for the benefit of the public at large."

Again, on page 544: "Car service associations are simply agencies employed by railroad companies to insure prompt, accurate and impartial assessing of demurrage; but in each instance it is assessed in favor of the railroad entitled to it, and it is collected by that railroad, sometimes by the car service association of which it is a member, sometimes by other of its various employes, according to the custom of the railroad in reference to its collection."

Those citations show that the railroad commission is not called upon to act under the law of 1898, so as to benefit any railroad or railroads, but the central idea controlling them is the general public good—expediting the transportation of freight, facilitating its delivery, and insuring prompter and more satisfactory service." The benefit to the railroad is an incident.

Keeping this guiding star in mind, the solution of the question in this case becomes easy.

The "delayage rules" so called, are but an extension of the system originally devised to more fully carry into effect the objects, ends and aims of the car service associations. They are an endeavor to complete the scheme—to accomplish the great desideratum of keeping the rolling stock under control, moving, ever going on. In this, the public good is the chief end. The railroads are interested, so are the consignor and consignee of freight—each and every one, collectively and individually. In any given case the railroad having the charges to pay might object, but the enforcement of the rules to carry out the purposes involved, might be to the good of even every other railroad in the car service association, in that it would insure the releasing of cars speedily, and enable them to send

them on their grinding mission of putting money in their purses.

Theoretically, the car service association looks after the delayage for the shipper, just as theoretically it looks after delayage of cars (or demurrage), for the various railroads; practically, the shipper looks after the matter where his interest is, and the several railroads do likewise where their interests are.

But counsel say that there is no consideration moving from the shipper to the railroad. None is necessary, but as a matter of fact it is well known that delay in forwarding shipments greatly injures the shipper, and this is a consideration. An instance is given in the present case where the appellee lost the trade of a customer because of delay in shipment by appellant.

Argued orally by *J. C. Longstreet,* for appellant.

Whitfield, C. J., delivered the opinion of the court.

The part of the rules of the railroad commission under review here is just this part of rule 10: "Likewise when cars are properly loaded, and shipping instructions given, the railroad agent must immediately issue bills of lading therefor; and if said car or cars are detained or held, and not carried forward within twenty-four hours thereafter, said railroad company shall be liable to said shipper for the payment of $1 per car for each day, or fraction of a day, that said car or cars are thus detained or held." This part of this rule establishes what is well known now as the right to make reciprocal demurrage charges. It is insisted by the appellant that the railroad commission had no power to make this rule. There is no question of interstate commerce even remotely involved in this case. The act authorizing this rule is ch. 82, p. 97, of the acts of 1898, which provides as follows: "That all laws, acts, and parts of acts giving authority to the railroad commission to supervise common carriers shall also apply to car service associations, or other associations governing or controlling cars or

rolling stock of railroads, at whatever place they do business in this state, and the same penalty fixed by law for disobeying the mandates or orders of the railroad commission shall apply to the car service associations as well as to other carriers." The rules in question (a copy of which is attached to the record and which the reporter will set out in full), were adopted June 8, 1904, to be effective June 18, 1904, and the rule here assailed was evidently adopted by the commission under the authority of the said statute of 1898, *supra.* It is also plain, from the language of the rules, that they were adopted with reference to car service associations operating in Mississippi, and not elsewhere, and were deemed necessary for the proper intrastate supervision of such car service associations.

It is said that the railroad commission has no power to fix charges known as "reciprocal demurrage charges." In § 4291 of the Annotated Code of Mississippi of 1892 it was provided that the commission "may fix all charges and shall supervise and regulate all persons, etc., who may own or operate express, telegraph, or telephone and sleeping car companies." Six years afterwards the act of 1898, above referred to, was passed. Eight years after that sec. 4843 of the Mississippi Code of 1906 inserted after the words "sleeping car companies," brought forward from § 4291 of the Code of 1892, the following words: "Car service associations, or other associations governing or controlling cars or rolling stock of railroads, etc."—incorporating, in other words, the provisions of the act of 1898, *supra,* in § 4843 of the Code of 1906 as to the supervision of car service associations. There can be no fair and rational construction of these statutes denying to the railroad commission the power to make rules as to reciprocal demurrage. There is no merit in the contention that the commission could only fix these charges after the car service association had first compiled the charges and handed them to the commission; in other words, that the commission could not originate the charges. Car service associations have never by

any law been required to submit any charges to the railroad commission on this subject. Even if such requirement had been made, however, it is far too narrow a construction of the beneficent powers intrusted in this matter to the railroad commission to hold that that commission is without power itself to originate the charges.

We have heretofore said that no question of interference with interstate commerce is presented in any wise by this record. The case of *Atlantic Coast Line Ry. Co.* v. *Commonwealth*, 46 S. E., 911, 102 Va., 599, may be usefully consulted in respect to this contention. The record, however, here presents no such question. It is certainly immaterial whether the commission in Virginia was a constitutionally created department of government, or, as in Mississippi, a legislatively created commission. The method of creation is one thing. The power given to it is another.

We considered this subject of car service associations and their right to impose demurrage charges in *Y. & M. V. R. R. Co.* v. *Searles,* 85 Miss., 556, 37 South., 952, 68 L. R. A. 715. We said there: "The main end and purpose of their existence is to prove a benefit to the consignor, carrier, and consignee by expediting the transportation of freight, facilitating its delivery, and insuring prompter and more satisfactory service by and for all alike." Let the words "for all alike" be especially noted. Again, at p. 556 of 85 Miss., p. 952 of 37 South. (68 L. R. A., 715); we said: "They [the car service associations] are in no wise connected with the internal management, or financial affairs, or corporate policy, of any railroad, having not even power of fixing demurrage charges, which it is their duty to assess." Again, on p. 543 of 85 Miss., p. 947 of 37 South. (68 L. R. A., 715), we said: "Acting under the power thus vested in it, the railroad commission adopted and promulgated certain rules in reference to demurrage charges, regulating the amount which could be imposed, and setting out, in detail, the circumstances under which they

might rightfully be levied, and then clothed the association with authority to collect in all proper cases. It should be observed that these rules fixing penalties for undue detention of cars were not devised for the benefit of the railroad companies alone, but were framed by the state railroad commission, a tribunal charged by law with the duty of supervising common carriers for the benefit of the public at large." These quotations ought certainly to make it plain that the right of car service associations to assess reasonable demurrage rates, subject to the supervision of the railroad commission, was not maintained by this court for the benefit of the railroad companies, or the car service associations, of the state, but for the benefit of the public alone.

Much is said in the brief of learned counsel for appellant about a supposed distinction between reciprocal demurrage charges, which are characterized as fines and penalties, and demurrage charges which are said to be rightfully imposed by the car service associations under the common-law doctrine of a warehouseman's right to a lien for warehouse charges; and it is earnestly insisted that, without any action of the railroad commission approving demurrage charges, they would be maintained because of this common-law doctrine, and that thus the right of the car service associations to impose demurrage charges exists independently of any statute of the state, or of any action of the railroad commission, but that the right of the railroad commission to fix reciprocal demurrage charges cannot be supported on any common-law doctrine, that there is no lien for them, etc. It will be noted that, on p. 543 of 85 Miss., p. 947 of 37 South. (68 L. R. A., 715), in the *Searles case,* this court characterized the charges for demurrage as "penalties for undue detention of cars," and says they were "devised"—that is, by law—not for the benefit of railroad companies, but for the "benefit of the public at large." It is very ingenious, doubtless, to find other and collateral support for car service charges for demurrage in the common-law doctrine

as to the right of warehousemen to a lien on the goods in the warehouse for storage, likening rather fancifully, as it seems to us, the ever-moving railroad car to the stationary warehouse. However sound this may be, in the absence of any statute, when the legislature has acted and dealt with this whole subject-matter of demurrage and reciprocal demurrage, authorizing the railroad commission to fix charges for demurrage and charges for reciprocal demurrage, both exclusively in the interest of the public at large, and neither with the slightest purpose of benefiting either the shipper or the consignee in any particular case, it is far too narrow a view to take of such wholesome and beneficent legislation to base support of its action exclusively upon any common-law theory. If there had been no common-law warehouse lien theory, the commission would, undoubtedly, under the legislative authority, have had the right to impose demurrage charges; and, if so, undoubtedly it had the converse, and necessarily correlated, power of imposing reciprocal demurrage charges. The purpose of all these charges is to benefit the public at large. On the one hand, the railroad commission, in imposing demurrage charges, had in view the purpose of requiring cars to be unloaded by consignees with all reasonable dispatch and delivered back to the railroad companies that they might go again into the traffic business to haul other freight of other consignees; and, on the other hand, the object of the railroad commission in imposing reciprocal demurrage charges was to compel the railroad companies, conversely, with the same end in view, to move cars, when loaded, with all reasonable dispatch to consignees, in order that they might, when unloaded, be promptly returned to the carrying of the traffic of the country. The purpose was to keep in constant, rapid movement all the cars railroad companies have, the country over, in service everywhere, on their own lines and interchangeably on other lines, so that the traffic of the country should proceed expeditiously, and the things

transported by freight cars all over the land be promptly everywhere delivered.

. In twenty states reciprocal demurrage measures are pending or have been enacted. Nearly all the organizations in the country representing large shippers have asked for reciprocal demurrage. It would correct many of the most serious defects from which the country is now suffering. The law of reciprocal demurrage is founded in the soundest common sense and the highest spirit of equity. If such laws are rigorously enforced, we will hear no longer of the freight congestion that has been so prevalent throughout the past winter, of thousands of empty cars standing unused in railroad yards in one section of the country, and coal famines in the other for the want of cars. Reasonable reciprocal demurrage rates, fairly enacted and justly and impartially enforced, will result in a quickened traffic the country over, in a just recognition on the part of the railway corporations of the land of what they owe in prompt freight schedules and an abundant supply of cars to the public at large, and in an equally just recognition on the part of the public of their duty promptly to unload traffic borne to them in cars, and send such empties back to aid in further traffic.

*We think the action of the court below was correct in every particular, and the judgment is affirmed.*