# HARDWICK FARMERS ELEVATOR COMPANY v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.[1]

January 28, 1910.

Nos. 16,362—(152).

**Reciprocal Demurrage Act of 1907 — Action Under Act — Evidence Not Reviewed.**

Chapter 23, Laws 1907, imposed the duty upon any railroad company to furnish suitable cars to all persons applying therefor in good faith, to provide and keep suitable facilities for handling the same, to receive and transport empty or loaded cars furnished by any connecting road, to furnish to the shipper the number of cars applied for in writing within forty-eight hours at terminal points and seventy-two hours at intermediate points from the receipt of the application. Section 11 provided: "The period during which the movement of freight or furnishing cars is suspended on account of strikes, public calamities, accident, or any cause not within the power of the railroad company to prevent, or during which the loading or unloading of freight by shipper or consignee is delayed by reason of inclement weather which would make loading or unloading impracticable, or any cause not in the power of said shipper or consignees to prevent, shall be added to the free time allowed in this act and counted as additional free time." In addition to damages the carrier was made responsible to the shipper for the sum of one dollar per day for every car failed to be furnished, together with reasonable attorney's fees for bringing such suit, to be taxed and paid as costs.

In an action brought thereunder the defendant railroad company asserted as a first defense that it was reasonably within the terms of the act, because a freight congestion had rendered it impossible for defendant to furnish cars sooner than it did. It is *held:* [First] that this was a question of fact, and that the verdict of the jury for plaintiff must be sustained, inasmuch as this court was not furnished with the transcript of the testimony and could not review the evidence.

**Act Constitutional — Not in Conflict with Interstate Commerce Act.**

For a second defense, defendant asserted the unconstitutionality of the law as an attempted regulation of interstate commerce, and as failing to

---

[1]Reported in 124 N. W. 819.

[Note] Requiring carriers to furnish cars as interference with interstate commerce, see note in 17 L.R.A.(N.S.) 364.

comply with the federal requirement concerning "due process of law." It is *held:* [Second]

1. The law by its terms applied to interstate and intrastate commerce. The merchandise transported between two points within this state, which was carried by defendant's lines through a neighboring state and back into this state, was interstate commerce.

2. The expression "any cause not in the power of said shipper or consignee to prevent" and the term "accident," which occurred in the enumerated cases excepted from the operation of the act, are to be broadly construed, and include all causes not reasonably within the power of the carrier to prevent.

3. The power of the government may be divided into four classes: (1) Those which belong exclusively to the states; (2) those which belong exclusively to the national government; (3) those which may be exercised concurrently and independently by both; (4) those which may be exercised by the states, but only until congress shall see fit to act upon the subject.

4. State laws enacted in the exercise of the police power and indirectly and remotely affecting interstate commerce, being in aid thereof and not a burden thereon, may be within the fourth class of cases and enforceable, unless superseded by some act of congress, if they are reasonable in their operation.

5. The so-called reciprocal demurrage law was designed, and in operation tended, to insure the prompt performance by the carrier of its common-law duty to furnish cars for transportation of freight, and was not displaced by the interstate commerce act as amended by the Hepburn law, primarily intended to secure reasonable rates and to prevent unjust discriminations.

6. The law made sufficient allowance for practical difficulties in railroad management, in its enumeration of exceptions to liability, and was reasonable and constitutional. Houston & Texas Central R. Co. v. Mayes, 201 U. S. 321, followed and applied.

Third. The provision requiring the payment of reasonable attorney's fees is not invalid because it imposes a charge on carriers, and not on debtors generally, inasmuch as the statute was enacted in the exercise of the police power of the state.

[Action in the district court for Rock county under Laws 1907, chapter 23 (R. L. Supp. 1909, §§ 2023–1 to 2023–13) to recover one dollar for every day's delay to furnish plaintiff with cars as demanded for the shipment of grain from the village of Hardwick to Minneapolis, Chicago or Davenport, Iowa, during the months of September and October, 1907, and $50 for an attorney's fee for

bringing the action.   Defendant's answer, which set forth the character of the movement of the grain and alleged that this was, in consequence, interstate commerce, as a defense complete in itself, was demurred to, and the court sustained the demurrer.

In its amended answer the defendant set up that at the times mentioned in the complaint there was upon defendant's lines and elsewhere an unusual and unprecedented congestion of traffic which defendant could not have foreseen, which it was beyond its power to relieve.   It alleged that it provided plaintiff with its full proportion of cars and at the earliest possible moment practicable; that to have sooner supplied them would have discriminated against other interstate traffic and to have done this would have violated the rules and order of the interstate commerce commission; that all traffic moved by defendant from Hardwick, Minnesota, to Minneapolis, Minnesota, as well as to the other points named, must be carried by it over its lines through Iowa as well as Minnesota; and Laws 1907, chapter 23, did not relate to such consignments as commerce between the states and cannot regulate such traffic, because so to do would violate the exclusive powers granted to congress by the federal constitution.

The case was tried before P. E. Brown, J., who denied defendant's motion to dismiss the case because the statute is invalid as to interstate shipments.   He submitted to the jury the question whether it was within the power of defendant to have furnished the cars when demanded.   The jury returned a verdict for plaintiff for $268.   Defendant's motion for a new trial was denied.   From the judgment entered pursuant to the verdict, defendant appealed.   Affirmed.]

This was an action brought by plaintiff and respondent elevator company against defendant and appellant railroad company under the so-called reciprocal demurrage law to recover one dollar a day for every day on which defendant failed at specified times to furnish cars to plaintiff for the movement of grain from a point in Minnesota to other points in Minnesota and to points in other states.   From judgment entered upon the verdict in favor of plaintiff this appeal was taken.   Other cases involving the validity of the same law were

submitted at the same time. All material relevant points made by various counsel are intended to be included in the opinion which follows.

So far as here involved, chapter 23 is as follows:

"Section 1. It shall be the duty of any railroad company to furnish suitable car or cars to every and all persons, without discrimination, who may apply therefor in good faith for the transportation of · any and all kinds of freight, * * * and also to receive and transport in like manner the empty or loaded cars furnished by any connecting road, to be delivered at any station or stations on the line of its road, to be loaded or discharged, or reloaded and returned to the road so connected. * * *

"When the owner, manager or shipper of any freight of any kind shall make application in writing to any superintendent, agent, or other person in charge of transportation of any railroad company, at any point that cars are desired in or upon which to ship any freight, it shall be the duty of such railroad company to supply the number of cars so required at the point indicated in the application within a reasonable time thereafter, not to exceed forty-eight hours at terminal points and seventy-two hours at intermediate points, from the receipt of such application, Sundays and legal holidays excepted, and shall supply such cars to the person or persons so applying therefor in the order in which such applications are made, without giving preference to any person. * * *

"When cars are applied for under the provisions of this chapter, if they are not furnished within the time herein stated, the railroad company so failing to furnish them shall forfeit to the party or parties so applying for them the sum of one dollar per day for each car failed to be furnished, to be recovered in any court of competent jurisdiction, together with all damages such applicant may have sustained."

"Sec. 10. The payment by said railroad company of demurrage provided in this act, shall in no way invalidate or offset any claim any shipper or consignee may have or make for damages occasioned by delay on the part of such railroad company, or other cause, but shall be a further remedy and in addition to any already existing.

Nor shall anything herein contained be held to lessen the duties of any common carrier in the shipment of live stock or other perishable property.

"Sec. 11. The period during which the movement of freight or furnishing cars is suspended on account of strikes, public calamities, accident, or any cause not within the power of the railroad company to prevent, or during which the loading or unloading of freight by shipper or consignee is delayed by reason of inclement weather which would make loading or unloading impracticable, or any cause not in the power of said shipper or consignee to prevent, shall be added to the free time allowed in this act and counted as additional free time."

"Sec. 13. When suit is brought to collect any of the damages, forfeitures or demurrage charges, provided for in this act, said suit may be brought in any court in this state having jurisdiction of the subject matter and parties under the then existing cause; and if the plaintiff therein recover judgment such plaintiff shall also recover a reasonable attorney's fee for bringing such suit, to be taxed as costs in other cases and paid as other costs by defendant in such suit."

*A. J. Daley* and *Stringer & Seymour,* for appellant.

All of the consignments referred to in the complaint and answer are interstate shipments, notwithstanding the fact that the point of origin and that of destination (in some cases) are in Minnesota. State v. Chicago, St. P., M. & O. Ry. Co., 40 Minn. 267; Hanley v. Kansas City Southern Ry. Co., 187 U. S. 617. Is chapter 23, Laws 1907, constitutional in so far as it may relate to interstate shipments? A penalty of one dollar per day per car for failure to supply cars, as required by the act, is imposed. The shipper can recover every penny of damage that he has sustained and then penalize the railway company for failure to supply cars. Not only is a penalty imposed, but the shipper is also indemnified for attorney's fees incurred in the suit which he may bring to recover such penalty. If this legislation should be held valid, it must result in a competition among the states in the imposition of penalties of the severest character, with the thought that the greatest penalty will secure the promptest car serv-

ice. While such extreme penalization might differ in degree, it would not in kind, in its interference with interstate commerce.

Can there be a better instance of the interference with interstate commerce than that illustrated by the evidence in this case? The grain on the Dakota division really began to move about September 20 or 21, 1907. The volume of business moving at the same time in the fall of 1907 was not only the largest in the history of the railway company, but largest in the history of the commerce of the country. There was an extraordinary congestion at Fort Worth, Texas, and at Galveston, all of which is supported by the reports of the interstate commerce commission, and is a fact well known in the history of United States commerce. The railway company is a great cotton and grain carrier. Cotton and grain are moved from Oklahoma and Texas and the southwestern states to Galveston upon the Gulf of Mexico, and from this port shipment is made to Liverpool and other foreign markets. It is not an exaggeration to state that during these months the situation of railway companies, and especially this appellant because of the movement of varied products along its lines from the lakes to the gulf, was one which defied solution. It is well known that the interstate commerce commission was consulted and that every effort was made to relieve the situation.

The interstate commerce commission has promulgated its rule that the local statutes with respect to penalization in matters of car service, and so-called demurrage laws, should, in the movement of interstate commerce, be absolutely disregarded. This instruction to the railway company is direct and unconditional. And in this connection the attention of the court is respectfully called to Supplement No. 1 to Tariff Circular 15 A, of the interstate commerce commission, which is as follows: "On March 16, 1908, the commission decided that the demurrage rules and charges applicable to interstate shipments are governed by act to regulate commerce, and therefore are within its jurisdiction, and not within the jurisdiction of state authorities. Any other view would open a wide door for the use of such rules and charges to effect the discriminations which the act prohibits."

The shipments being interstate in their character, it is, therefore,

to the federal decisions that the courts must look for interpretation. Wold v. J. B. Colt Co., 102 Minn. 386; North Wisconsin Cattle Co. v. Oregon Short Line R. Co., 105 Minn. 198.

A reciprocal law practically like the Minnesota law was before the supreme court of the United States. Houston Texas Central R. Co. v. Mayes, 201 U. S. 321; McNeill v. Southern Ry. Co., 202 U. S. 543. In Arkansas a reciprocal demurrage law is practically the same as that of Minnesota. See section 2, Act No. 193, Acts of Arkansas, 1907, bottom of page 456. St. Louis, I. M. & S. Ry. Co. v. Hampton, 162 Fed. 693. In that case the court states that the principle which lies at the foundation of the Mayes case is interference with interstate commerce. A recent case has been decided by the court of common pleas of Franklin county, Ohio, number 54,989, fully supporting this position with respect to movement of interstate commerce. It is known as the Ohio Car Service case—opinion rendered by Judge Kinkead. See also a case directly in point State v. Adams, 171 Ind. 138.

*C. H. Christopherson,* for respondent.

Congress has not legislated upon this subject. The sole object and purpose of the interstate commerce act, as amended by the railroad rate act of June 29, 1906, was to make discriminations unlawful, and to provide that "all charges made for any service rendered or to be rendered in the transportation of passengers or property aforesaid, or in connection therewith shall be just and reasonable." This is something separate and apart from the purposes and objects of the present act. In fact the enforcement of damages for failure to furnish cars would operate to further the purposes of the interstate commerce act. It would tend to destroy discrimination as railroads would be more zealous to furnish cars to all. The demands of the public generally would be satisfied. 17 Am. & Eng. Enc. (2d Ed.) 103.

It is scarcely necessary to point out that the commission is without authority under any existing law to deal effectively with this condition (car shortage). Broadly speaking, the regulating power of congress has not been exercised to control the physical operations of

interstate railroads—aside from the safety appliance requirements—
either as respects the movements of trains or the supply of equipment.
It is true that the recent amendments include a very broad definition
of "transportation" and impose in general the obligation to provide
all needful facilities, but this is perhaps not much more than a state-
ment of common law obligations which already existed.  See Patter-
son v. Missouri, 77 Kan. 236.

JAGGARD, J. (after stating the facts not within [] as above)

The defenses interposed were, first, that because of a freight con-
gestion, one of the greatest in the history of commerce, it was impos-
sible for defendant to furnish cars any sooner than it did.  On the
evidence adduced, the trial court submitted to the jury the question
whether or not it was within the power of the railroad company to
have furnished the cars when demanded.  The verdict of the jury
for plaintiff must be sustained on this point, for this court was not
furnished with a transcript of the testimony.  No question on the sub-
ject is therefore presented for our consideration.  The verdict must
stand, in the absence of other objection.  Mead v. Billings, 40 Minn.
505, 42 N. W. 472; Brackett v. Cunningham, 44 Minn. 498, 47 N.
W. 157.

The second defense asserted was that the law was unconstitutional
under the state and federal constitutions, especially as an attempted
regulation of interstate commerce in violation of section 8, art. 1,
Const. (U. S.) and the laws of congress, and has failed to comply
with the acts of congress and section 1, Amend. 14, (U. S. Const.)
concerning "due process of law."

1. The commerce was interstate.  Even the merchandise trans-
ported between two points within this state was conveyed by lines of
the defendant through a neighboring state to its destination within
this state, and was therefore not intrastate commerce.  See State
v. Chicago, St. P., M. & O. Ry. Co., 40 Minn. 267, 41 N. W. 1047, 3
L. R. A. 238, 12 Am. St. 730; Patterson v. Missouri, 77 Kan. 236,
94 Pac. 138, 15 L. R. A. (N. S.) 733; Hanley v. Kansas City South-
ern Ry. Co., 187 U. S. 617, 23 Sup. Ct. 214, 47 L. Ed. 333.  This

conclusion follows also from the admissions of the pleadings and the unchallenged charge of the trial court.

2. The law needs little construction. By its terms it applies to both intrastate and interstate commerce. Its language is clear enough, except that of section 11. It is thereby made a defense in an action to enforce one dollar a day demurrage that certain conditions in fact exist.

In their enumeration, the general expression "or any cause not within the power of the railroad company to prevent" is preceded by "strikes, public calamities, accident," and is followed by "inclement weather" and by "any cause not in the power of said shipper or consignee to prevent." If these words had been placed at the end, instead of the middle, of the sentence, no considerable difficulty would have been presented. The exceptional circumstances, however, which precede and follow, are substantially of the same nature. They all belong to the class of causes of delay over which the railroad company had no control and for the effects of which it could not reasonably be held accountable. The reason for the application of the familiar rule "ejusdem generis" fails; or it may be more accurate to say that its application results in the construction for which the state contends. Such a conclusion, moreover, is in furtherance and not in contradiction of the natural sense and obvious meaning of the words under consideration. It is to be noted that the restrictive word "other," which has primarily germinated the doctrine of "ejusdem generis," is not used, but the inclusive word "any." As to the broad construction to be given where "other" has been used, see U. S. v. Bitty, 208 U. S. 393, 28 Sup. Ct. 396, 52 L. Ed. 543; State v. Western Union Tel. Co., 96 Minn. 13, 104 N. W. 567; Detroit v. Common Council, 125 Mich. 673, 85 N. W. 96, 86 N. W. 809, 84 Am. St. 589; State v. Western Union, 165 Mo. 502, 65 S. W. 775.

Again, as will subsequently appear herein, if the language be thus broadly construed, the act will be constitutional; if it be narrowly construed, it will be unconstitutional. There is no doubt as to the duty of the court to adopt the view which will sustain the law. The expression naturally refers to causes not absolutely, but reasonably, within the power of the railroad company to prevent. Any other

110 M.—3.

meaning would be strained, would vitiate the law, would be opposed to common sense, and would oppose authority. Darlington v. Missouri, 216 Mo. 658, 116 S. W. 530 (involving the construction of a reciprocal demurrage law), is specific as to principle. It would be idle to collate cases.

Finally, the word "accident" is significant. In Patterson v. Missouri, supra, a similar question was presented to the court, and "unavoidable accident" was interpreted to mean "unavoidable on the part of the company sought to be penalized."

Construing the clause as a whole, we conclude that the enumerated defenses extend to any cause beyond the power of the railroad company to reasonably prevent. It includes as excepted cases all the contingencies recognized by the Texas statute involved in Houston & Texas Central R. Co. v. Mayes, 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772 (post), all those set forth in that opinion for failure to except which that statute was there held invalid, the defense here asserted, and others of the same kind. Thus it includes the objection by one of the defendants in another similar action that the statute entirely disregarded the quantity of freight to be loaded upon car or cars, the number of cars and the side track facilities which the particular shipper may have to handle, whereby the carrier might be unjustly deprived of the use of its surplus cars required to be furnished above those which can be used. If, however, the facts in such case should show that it was unreasonable to charge demurrage, the carrier would have a complete defense; if the facts should show that it was reasonable to impose the charge, the carrier would have no just ground of complaint. Darlington v. Missouri, supra, to which counsel for the company refers us in this connection is in no wise inconsistent.

3. The so-called reciprocal demurrage law as thus construed is not unconstitutional. In Ex parte McNiel, 13 Wall. 236, 20 L. Ed. 624, Mr. Justice Swayne said: "In the complex system of polity which prevails in this country, the powers of government may be divided into four classes: (1.) Those which belong exclusively to the states. (2) Those which belong exclusively to the national government. (3) Those which may be exercised concurrently and independently

by both.   (4) Those which may be exercised by the states, but only until congress may see fit to act upon the subject." Whatever effect subsequent decisions may have had upon the exact lines of demarcation between these classes of cases, it is certain that between the one pole of facts which clearly constitute a clear violation of federal power in the regulation of interstate commerce and the opposed pole of those which bring a given instance within the unquestioned power of the states, there is a definitely recognized intermediate zone in which state laws enacted in the exercise of the police power, which indirectly and remotely affect interstate and foreign commerce, are to be enforced unless they are "superseded and displaced by some act of congress."   Hennington v. Georgia, 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166; Railroad Co. v. Haber, 169 U. S. 613, 18 Sup. Ct. 488, 42 L. Ed. 878; cases collected in Pittsburgh v. State (Ind.) 87 N. E. 1034, at page 1040 (involving a "full crew" act).   Such laws are not within prohibited "regulations of interstate commerce, and it is only when they operate as such in the circumstances of their application and conflict with the express or presumed will of congress exerted upon the same subject that they can be required to give way to the paramount authority of the constitution of the United States." Gray, J., in Gladson v. Minnesota, 166 U. S. 427, 17 Sup. Ct. 627; 41 L. Ed. 1064.   And see Lake Shore & Michigan S. Ry. Co. v. Ohio, 173 U. S. 285, 301, 19 Sup. Ct. 465, 43 L. Ed. 702.

Many such cases will be found summarized in Cleveland, C. C. & St. L. Ry. Co. v. Illinois, 177 U. S. 514, 20 Sup. Ct. 722, 44 L. Ed. 868.   McNeill v. Southern Ry. Co., 202 U. S. 543, 26 Sup. Ct. 722, 50 L. Ed. 1142, is in accord, none the less because it also asserts the converse proposition "that any regulation of such subject made by the state or under its authority, which directly burdens interstate commerce is a regulation of such commerce, and repugnant to the constitution of the United States."   Our examination of the relevant decisions has convinced us that the current assertion of the invasion upon the traditional functions of the state by the decisions of the federal supreme court in this matter is unfounded and that the extent to which wide police powers over the instrumentalities of transportation employed in interstate and foreign business has been preserved

to the states is impressive.    See Calvert, Regulation of Commerce, [Preface], IV.

(b) The law here in controversy is fairly within that middle zone. It conflicts with no congressional action previously taken or reasonably presumed; for the primary purpose of the interstate commerce act (Act February 4, 1887), 24 St. 379, as amended by Act June 29, 1906, 34 St. 584 (the Hepburn law) was to secure reasonable rates and to prevent unjust discriminations.    It affects interstate commerce in an indirect or remote manner only.    Neither its purpose nor its operation constitutes a burden on such commerce.    Its enforcement must tend to secure the prompt performance by the carrier of its common-law duty to furnish cars for transportation of freight and thus to add to the volume of matter to be transported within and without the state.    Without euphemism it is in aid of commerce of both kinds.    As was said in Seegers v. Seaboard, 73 S. C. 72, 52 S. E. 798, 121 Am. St. 921, "the penalty is but a means to that end."    And see Charles v. Atlantic, 78 S. C. 36, 58 S. E. 927, 125 Am. St. 762. As hereinbefore construed, it conforms to the federal test of reasonableness (as will subsequently be set forth).

(c) Upon the necessary assumption of correct legislative determination of commercial expediency, there are obvious practical advantages in permitting the states to legislate on this subject.    So to do secures the flexibility of local legislation and the certain conformity with federal standard.    In the nature of things the legislatures of the various states are peculiarly familiar with and in an especially good position to determine the expediency of such a law in the geographical and commercial situation presented, with due reference to the density of population, nearness to markets, the productiveness of the region, the perishability of products, climatic conditions, the nature and extent of actual railroad facilities, the difficulties of movement, the variation in demand, and with due reference to many other facts involved in the problem of transportation.    It appears probable that uniform congressional legislation would lack the flexibility and adaptability of local laws.    "The failure of the states to adopt regulations to meet a supposed need, either by indifference to the wrong or delinquency, or by such an exercise of the power that, on account of

the absolute requirements imposed, a regulation cannot pass the supreme test of reasonableness, results in agitation for federal regulation of matters concerning which the power of congress is undoubted. There would be no need to invoke the exercise of the federal power in such cases if states adopted reasonable regulations to satisfy local requirements or opinion." Calvert, Regulation of Commerce, IV. Consistent determination of the legal aspects of such a law is certainly secured, because the ultimate decisions of all essential questions arising under it rest, not with the courts of the various states, but with the highest federal tribunal. If the decision of legal issues was left to the state courts, there would be variety and confusion in conclusion. The present system, in its legal as distinguished from its economical aspects, is capable of proving an advantage both to the carrier and shipper.

(d) The authorities sustain the constitutionality of the law. The decisions of the federal supreme court control absolutely. Houston & Texas Central R. Co. v. Mayes, 201 U. S. 321, 26 Sup. Ct. 491, 50 L. Ed. 772. The court in that case considered a railroad demurrage law enacted by the legislature of Texas, which for all purposes here involved was the same as the statute under consideration, except that (1) the amount charged for each day's delay was $25, and (2) that the enumerated cases exempted from its operation were extremely limited.

That decision determines (1) that in the present state of actual and presumed congressional action the state is able in the exercise of its police power to make reasonable rules in regard to the method of carrying on intrastate business, and to make laws compelling railroads to furnish adequate facilities for transportation of both freight and passengers; (2) that a demurrage law which undertakes to enumerate exceptions to liability must make sufficient allowance for practical difficulties in railroad operation; (3) that the Texas statute was "not far from the line of proper police regulation," but that it failed to recognize as proper defenses many contingencies for the results of which it was unreasonable to hold the carrier responsible. See Calvert, Regulation of Commerce, 95. It follows that the present law is valid.

The interpretation which other courts have placed on such a law has not been· consistent, but taken as a whole tends to sustain this conclusion. Oliver v. Railroad, 89 Ark. 466, 117 S. W. ·238, in an opinion by Norton, J. ("Special Judge"), regarded the Mayes case as refusing to enforce the law upon the ground that the requirement that cars be furnished transcended the rights of the state to burden interstate commerce. The law, therefore, was invalid ·as to interstate commerce, but valid as to intrastate commerce. We think that the opinion plainly misconstrued the Mayes case. Cf. Southern v. Melton, 133 Ga. 277, 65 S. E. 665, as to intrastate commerce.

In St. Louis, I. M. & S. Ry. Co. v. Hampton (C. C.) 162 Fed. 693, the opinion by a district judge was oral. It held that an Arkansas law was an interference with interstate commerce. · Its requirement to furnish cars was absolute, and made no exception for cases of a sudden congestion of traffic, actual inability to furnish cars by reason of their temporary detention in other states or in other places within the same state, and none for interference with traffic by wrecks, accidents, or strikes. In this regard it was primarily and obviously different from the present statute. Moreover, the statute there construed involved a penalty of five dollars per day.

McNeill v. Southern Ry. Co., supra, concerned a state commissioner's order compelling a railroad company to deliver cars containing interstate shipments beyond its right of way to a private siding. This was held unlawful interference with interstate commerce. This case is evidently not specifically in point. Nothing in the opinion on the general subject seems to indicate any leaning to defendant's view.

In Southern v. Commonwealth, 107 Va. 771, 60 S. E. 70, 17 L. R. A. (N. S.) 364, decided in 1908 subsequent to any congressional action on the subject, a rule promulgated by the state corporation commission was held unreasonable and void as applied to shipments outside of the state, because it imposed "even a greater burden on interstate commerce than the provisions of the Texas statute." That court consisted of five judges. All concurred in the conclusion that the particular rule was invalid. Three judges wrote concurring opinions, the effect of which is that it is within the power of the state under the Mayes case to make reasonable regulation as to the furnish-

ing of cars by railroad companies, not only for intrastate but for interstate commerce, and that the crucial test of license to that effect was its reasonableness. The opinion itself contains a direct statement of this view of the law. With its application to the particular circumstances there in issue we have no present concern.

The conclusion here reached has been specifically sanctioned. In Patterson v. Missouri, supra, a reciprocal demurrage law was held valid, although it affected interstate business. It was held to be an aid not a burden to such commerce. It was distinguished from the Texas case (1) in imposing a penalty of one dollar a day as here, instead of twenty-five dollars a day, an amount "merely nominal, and * * * not sufficient * * * to furnish any inducement to order cars not actually needed," and (2) because, while the Texas case contained inadequate enumeration of exceptions, the Kansas law recognized as a defense any "unavoidable cause."

To the same effect is Stone v. Atlantic Coast, 144 N. C. 220, 56 S. E. 932, which also construed the point in the Mayes case as expressing an opinion that the statute was not far from the line of police regulation, but fell on the wrong side of the line. Yazoo v. Keystone, 90 Miss. 391, 43 South. 605, is to the same effect and see valuable note to 13 Am. & Eng. Ann. Cases, 960, at page 964, and see Atlantic v. Commonwealth, 102 Va. 599, 46 S. E. 911; Railroad Co. v. Melton, 133 Ga. 277, 65 S. E. 665, at page 674; Darlington v. Missouri, 216 Mo. 658, at page 675, 116 S. W. 530, at page 535, in which Graves, J., said "that the state has a right within certain limits to regulate demurrage charges is not seriously disputed, nor could it be."

Third. One defendant urges that the provision requiring the payment of attorney's fees is invalid, because it places upon those who under the terms of the statute owe and do not pay demurrage a penalty not imposed upon debtors generally. Thus the carrier is denied the equal protection of the law and suffers a taking of property without due process of law.

We are referred to Gulf, C. & S. F. Ry. Co. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666. That case involved the constitutionality of a law requiring carriers to pay attorney's fees on

their failure to pay claims for less than fifty dollars for labor, damages, overcharges on freight, or for the killing of stock. It was held that this was a statute which compelled the payment of indebtedness, but which did not come within the scope of the police power. Three justices dissented. In the case at bar, however, the law was enacted in the exercise of police power. The case cited, and the class of authorities to which it belongs, have no relevancy to the issues here presented.

That this demurrage charge has been fixed in part at a definite sum of one dollar a day for each car, and in part in an uncertain sum to be determined by the reasonable value of the services actually rendered in each case, to be taxed and paid as costs, is no valid objection to this part of the law. If this particular provision, however, were void, it would not affect the substance of the statute.

Affirmed.